**ALLAPATTAH SERVICES, INC., et al., Plaintiffs,**

v.

**EXXON CORPORATION, Defendant.**

No. 91–0986–CIV–GOLD.

United States District Court, S.D. Florida.

July 6, 2006.

Jewel H. Grutman, Lauderdale, FL, Russel A. Cline, Crippen & Cline, Salt Lake City, UT, Daniel G. Jarcho, Mckenna Long & Aldrige, Washington, DC, Gerald M. Bowen, Oakhill, VA, Marshall Joel Osofsky, Moyle Flanigan Katz Kolins Raymond & Sheehan, West Palm Beach, FL, Leah Lariviere, Pertnoy Solowsky & Allen, Sidney Mark Pertnoy, Jay Howard Solowsky, Mark P. Dikeman, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Eugene E. Stearns, Thomas Emerson Scott, Jr., Cole Scott & Kissane, Herman Joseph Russomanno, Russomano & Borello, Miami, FL, for Plaintiffs.

Jamie Lynn Zysk, Hunton & Williams, Terry L. Sullivan, Stuart H. Harris, Martin F. Cunniff, Robert J. Brookhiser, Robert G. Abrams, Coral Gables, Burlington, Weil, Schwiep, Kaplan & Blonsky, Miami, FL, Alejandra Hernandez Pennie, Ted Christopher Craig, Thomas Richard Julin, Martin Leonard Steinberg, Robert Wallis, Exxon Corporation, Legal Department, Houston, TX, Rene J. Mouledoux, Darren B. Bernhard, Howrey Simon Arnold & White, Washington, DC, for Defendant.

## ORDER ON PETITIONS FOR AN AWARD OF ATTORNEYS' FEES, COSTS, AND REIMBURSABLE EXPENSES AND FOR INCENTIVE AWARDS TO NAMED PLAINTIFFS

GOLD, District Judge.

### I. INTRODUCTION

**THIS MATTER** is before the Court on the Attorneys' Fee Petition by McKenna, Long & Aldridge LLP [DE # 2108]; Application/Motion by Rylyns Enterprises, Inc. for an Incentive Award [DE # 2109]; Attorneys' Fee Petition by the Grutman Firm [DE # 2112]; Petition of Class Representatives Allapattah Services, Inc., Alberto Gonzalez, Robert Lewis, Inc. and John Pinder (the "Florida Representatives") for an Incentive Award [DE # 2116]; Motion by Certain Class Representatives [Paul Bove, Martin Cook, George Dalton, R. William McGillicuddy and David Wise] For A Common Benefit

Award [DE # 2118]; [1] Petition by Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A. [hereinafter "Stearns, Weaver"] for Attorneys' Fees in Three Fee–Shifting States [DE # 2124]; Petition by Stearns, Weaver for Attorneys' Fees, Costs and Reimbursable Expenses [DE # 2126]; Motion by Pertnoy, Solowsky & Allen [hereinafter "Pertnoy & Solowsky"] for Attorneys' Fees Against Exxon Under Court's Fee Shifting Order of September 23, 2004 [DE # 2129]; Motion by Pertnoy & Solowsky for Attorneys' Fees and Reimbursable Expenses [DE # 2131]; Motion by Gerald M. Bowen to Accept Fee Petition and Deem It Filed Nunc Pro Tunc [DE # 2174]; Verified Petition of Attorneys Farrell & La Mantia For An Award Of Attorneys' Fees [DE # 2626, 2627 & 2630]; Supplement by Grutman Firm To Motion For Attorneys' Fees and Costs [DE # 2628 & 2629]; Superseding Motion By Pertnoy & Solowsky for Attorneys' Fees and Reimbursement of Expenses [DE # 2635]; Stearns Weaver's Revised and Supplemental Petition For An Award Of Attorneys' Fees, Costs and Reimbursable Expenses [DE # 2637 & 2638], and Supplement to Application of Class Representatives Paul Bove, Martin Cook, George

Dalton, R. William McGillicuddy and David Wise For A *Common Benefit Fund* Award [DE # 2634],[2] and an Emergency Motion by Stearns Weaver for Alteration of Attorneys' Fees and Incentive Award Procedures [DE # 2864].[3]

By my Amended Order on Attorneys' Fees and Incentive Awards Procedures, dated February 7, 2006 [DE # 2613], I bifurcated the hearings on attorneys' fees and incentive awards. Oral argument on the percentage of attorneys' fees and incentive awards to be awarded to Class Representatives was held on Thursday, April 27, 2006. The evidentiary hearing addressing the allocation of attorneys' fees among Class Counsel was held on Wednesday, May 3, 2006, Thursday, May 25, 2006, and Friday, May 26, 2006. The evidentiary hearing concerning the allocation of incentive awards among the Class Representatives was held on Wednesday, June 5, 2006. Final oral argument was held on Monday, June 26, 2006.

In this Order, I first address the percentage award of attorneys' fees to be approved for Class Counsel and the entitlement to, and percentage of, incentive awards to be awarded to the Class Representatives.[4] I next address the allocation

1. Class Representatives Martin Cook and David Wise are named plaintiffs in this class action. Class Representative George Dalton owns the corporation G.G.S.K., Inc. and G.G.S.K.1., Inc., which are named plaintiffs in this action. Similarly, Class Representatives Paul Bove and R. William McGillicuddy own named plaintiffs Lee–Langley Corp. and Willston Center Autocare, Inc., respectively.

2. The various motions and supplements were accompanied by numerous affidavits, appendices and exhibits. See Docket Entry Numbers [DE # s]: 2110, 2113, 2116–2122, 2127, 2132, 2136, 2143–2156, 2627, 2629–2630, 2634 and 2638.

3. Since the filing of the various motions, the Law Firms and Class Representatives have filed numerous additional matters in support of their petitions: *See* DE # s 2792, 2801,

2802, 2803, 2804, 2805, 2806, 2807, 2808, 2809, 2810, 2811, 2814, 2815, 2816, 2817, 2824, 2822, 2823, 2827, 2836, 2833, 2837, 2862, and 2863.

4. I will address the amount of costs and reimbursable expenses to be awarded to Class Counsel in a separate order. I have referred the matter to Special Master Thomas E. Scott to conduct a detailed review and provide a report and recommendation to the Court on the proper amount of costs and reimbursable expenses to be awarded. He is to do so after applying the appropriate legal standard for assessment of court costs and upon assessing the reliability and reasonableness of the requested reimbursable expenses and costs. The Special Master is permitted to retain the services of an accountant to assist in the review.

of the fees and awards. Finally, I determine the manner of payment of both attorneys' and incentive awards.

For reasons which I address at length in this Order, I hereby establish the percentage to be awarded. I conclude that Class Counsel should be awarded an attorneys' fee of thirty-one and one-third percent (31 and 1/3%), and that the Class Representatives should be awarded an incentive award of 1.3% (as corrected) to be divided equally among the eight Class Representatives. Class Representative McGillicuddy's reduced incentive award will be paid by Gerald Bowen whose attorneys' fee will be partially forfeited.

Without doubt, this Order deals with a lot of money for attorneys' fees and incentive awards. A casual observer, not familiar with the case, may readily conclude that the attorneys' fees and incentive awards are too high. This case, however, is unique. This is not a situation where a class action is brought, soon settled, and Class Members receive an insignificant award and the lawyers get millions. This is a case that has lasted fifteen years, resulted in two trials, extensive appeals including before the United States Supreme Court, a hotly contested Claims Administration Process, and a settlement whereby Class Members will receive their full compensatory damages and nearly all of their prejudgment interest. It is an unprecedented case where over ninety-two percent of the Class Members will receive a recovery and where, through settlement, twenty-one States will be permitted to participate in any remaining distribution in favor of currently unknown Class Members.

I now articulate, in summary form, the essential rationale behind the award of attorneys' fees in this case. Class Counsel refers to it as the "Gold Standard". Any similarity to this Judge's name is merely coincidental. The essence is straight-forward. The amount of attorney's fees awarded should directly correlate to the number of Class Members benefitted; the amount of money received by each class member; and the risk borne by Class Counsel, over time, in achieving the benefits obtained. Attorneys' fees should be structured as an incentive for lawyers to risk achieving the highest possible benefits for the greatest number of Class Members. This is what happened in this case. It was not only the size of the verdict achieved that was significant, but the staggering number of over 11,000 Class Members who were identified to share in the award.[5]

During all this time, the attorneys have received no fees and litigated at substantial risk to themselves and in the best interest of the Class. It is time for their contributions, and that of the Class Representatives, to be recognized. The Class itself has recognized the contributions involved by their lack of any significant objection to the awards requested.

---

**5.** Subsequent to the verdict, Class Counsel requested this Court to order Exxon to post the full amount of damages, as ministerially calculated by the Court, into a common fund which, in turn, would allow for attorneys' fees to be paid prior to the Class Administration Process and leave for the Claims Administrator the burden of finding the Class Members through advertising and direct contact. For a number of reasons, I denied the relief sought.

Even if I had ordered payment of damages into a common fund, I would not have awarded attorney's fees at that time. By linking the potential award of attorneys' fees with the success of the Claims Administration Process, I aligned the interests of Class Counsel in receiving a high percentage fee with that of each potential class member in participating in the Claims Administration Process and receiving the maximum recovery allowable.

## II. Background

### 1. Current Requests For Attorneys' Fees and Class Awards; Summary of Objections Filed, and Historical Background Concerning Fee and Incentive Petitions.

The above listed petitions for attorneys' fees and class awards were filed prior to the parties' announcement of a proposed settlement which was negotiated during the Claims Administration Process. Since then, I have received supplemental petitions from Stearns Weaver; Pertnoy & Solowsky; the Grutman Law Firm, and from several of the Class Representatives. In their initial petitions for attorneys' fees, Class Counsel filed requests for an award of attorneys' fees not to exceed one-third of the recovery and an award of litigation costs and expenses (not to exceed 5% of any recovery). The Class Representatives also filed petitions seeking incentive awards of 1.5% (in the aggregate to be divided among them) of any recovery.

Following the original class notification regarding a proposed hearing on the award of attorneys' fees and incentive fees,[6] and the subsequent re-notification in conjunction with the Fairness Hearing, six Class Members filed objections to the petitions for attorneys' fees and costs.[7] Only three Class Members objected to the petitions by Class Representatives for incentive awards. Of the Class Members who filed objections, three—Thomas Lee, Josephine Choi and Larry Freeland—are represented by an attorney. These three Class Members also filed objections to the proposed incentive awards. All three of these Class Members are represented by Russell A. Cline who has filed an affidavit claiming that he represents in excess of 400 claimants in the Claims Administration Process. Mr. Cline is currently in a dispute with Class Counsel in the Claims Administration Process to determine who actually represents the claimants at issue. This matter remains unresolved at the present time.

Nonetheless, I have reviewed Mr. Cline's objections and find them to be without merit.[8] Mr. Cline essentially argues that, under the *Camden I* method of

6. It became necessary to publish a detailed notice to the Class setting forth the proposal for incentive awards and attorneys' fees, and setting a date for a final hearing, so that, if granted, appropriate fees could be awarded in conjunction with final judgments entered in the Claims Administration Process. This hearing was postponed when the settlement was announced. Of significance, no member of the Class filed any objection to the proposed attorneys' fees and incentive awards within the prescribed time period. The objections at issue arose after the settlement itself was re-noticed with the right to again object to attorneys' fees and incentive awards.

7. Three objections were directly from Class Members. One Class Member thought that attorneys' fees should be set at an hourly rate, plus an "annual raise" and warned against "sneaking extra profit by inflating costs." Another complained that there should not be a duplication of attorneys' fees between Class Counsel and the "Claims Compensation Bureau, Inc.," with whom the Class Member signed an agreement for services. [This matter is currently before the Special Master]. Finally, another Class Member filed an objection claiming that an award of $353,000,000.00 in attorneys' fees is "outrageous," especially given that the "... settlement [is] already below the full amount of the claims held by the class members." The Class Member stated that he never agreed to pay "a third of his claim" and recommended that the attorneys "... should be paid by the hour at a normal rate of billing."

8. I find of interest that Mr. Cline has entered his own fee agreements with Class Members which envision contingent fees as high as 40% for simply filing a claim when Class Counsel has done all the work. Although Mr. Cline claims to represent over 400 claimants in the Claims Administration Process, only three have authorized him to file objections. At the end of the day, Mr. Cline will have to appear before this Court to justify his fees.

calculating attorneys' fees, the benchmark range in this case should be between six and ten percent. As to the incentive awards, Mr. Cline objects to the absence of specific monetary declarations by Named Class Representatives Paul Bove, George Dalton and David Wise, and further argues that there should not be an aggregate percentage amount awarded to the Named Class Representatives as a whole. All of these matters are discussed at length in this Order.

At the time the petitions for attorneys' fees and incentive awards were originally filed, it was not possible to determine the magnitude of the total recovery to the Class because the total could only be derived after completion of the Claims Administration Process. A percentage of an uncertain number would not allow calculation of the request for attorneys' fees or incentive awards in dollars or as a percentage of each claim. These circumstances have changed radically as a result of the negotiated settlement reached by the parties during the Claims Administration Process and approved by the Court on April 7, 2005 following a Fairness Hearing [DE #2773]. Of considerable significance to the consideration of appropriate attorneys' fees and incentive awards, I note that more than 11,000 individual notices were sent to members of the Class which detailed the terms of the settlement and the proposed award of attorneys' fees and incentive awards. The notices were specific that the amount of attorneys' fees requested could be as high as $353.333 million and the incentive awards could reach $15.9 million. Examples were provided in the notice as to how the requested attorneys' fees and incentive awards could reduce individual claims. Accordingly, I conclude that each Class Member clearly received notice of the magnitude of the requested fees and awards.

In terms of the settlement agreement, only one objection was filed which has been subsequently withdrawn. It dramatically understates the obvious that the near totality of the Class has no objection to the proposed award of attorneys' fees and incentive awards, as were detailed at length in the notice to the Class.

Going back historically, on December 22, 2005, Plaintiffs filed a "Motion to (1) Preliminarily Approve the Terms of the Settlement of this Action, (2) Approve the Form of Notice to the Class of the Settlement, (3) Establish the Means of Communication of the Notice to the Class, (4) Schedule the Time for Objections to be Made to the Proposed Class, (5) Schedule the Time for Objections to be Made to the Proposed Settlement and to Petitions for Attorneys' Fees and Class Representatives' Incentive Awards, and (6) Schedule a Final Fairness Hearing on the Proposed Settlement" [DE #2561]. The proposed settlement [discussed more fully below] contemplated that Exxon was to deposit $1.075 billion into a Settlement Common Fund.

As I mentioned, the effect of reaching a settlement amount eliminates uncertainty as to the amount sought by Class Counsel and the Class Representatives in both percentages and dollars. Of the $1.075 billion payment Exxon paid in settlement of the case, $15 million will be allocated to offset the fee obligation of claimants with stations in Texas, Arizona, and Arkansas. Accordingly, Class Counsel now seeks to recover their percentage award against $1.060 billion of the amount Exxon has paid. Although there are disagreements among the law firms as to their respective entitlements to recover attorneys' fees, they do agree that in no event should the total legal fees exceed one-third of the total recovery in the case, or one-third of every claim (including the claims of the

states). That is, if a one-third recovery was granted, the total of attorneys' fees to be divided among the five law firms would be $353.33 million.[9] At the April 27, 2006 hearing, all of the law firms, except for Mr. Gerald Bowen, have agreed to limit their claim of recovery to 31 and 1/3 % of the Settlement Common Fund.[10] Mr. Bowen does suggests that a cap should not exceed twenty (20) percent. In addition, the five law firms request reimbursement of expenses in the amount of $4.2 million, and further request the Court to permit an estimated $1.5 million in expenses for continuing the Claims Administration Process.[11]

The nine Class Representatives also filed petitions seeking recovery of incentive awards to be shared among them of 1.5% of the total Settlement Fund. The sum total of the requested incentive awards totals $15.9 million. The Class Representatives include their claim for out-of-pocket costs and expenses in the 1.5% incentive award they seek. Thus, the total of all attorneys' fees, expense reimbursements, and incentive awards is 35.37% (expressed as a percentage of the

$1.060 billion) and $374.88 million (expressed in dollars).

By Order dated January 31, 2006 [DE # 2607]. I preliminarily approved the settlement upon recommendation of the parties and the Special Master. Notice was provided and a fairness hearing was scheduled for April 5, 2006. The notice provided that Class Members could both object to the settlement, and they could, once again, raise any objection to the proposed award of attorneys' fees and incentive awards now that the actual dollars involved could be calculated against the Settlement Fund. Only one objection (later withdrawn) was filed to the settlement, and, as I mentioned, only six objections were filed regarding attorneys' fees and incentive awards.

The issues associated with these petitions, as amended, are varied and complex. In this portion of the Order, I begin by briefly discussing the case history and the settlement. I next discuss the method of awarding attorneys' fees to Class Counsel, the proper percentage to be awarded, and, the award of incentive fees to the Class

---

9. The Farrell & La Mantia Law Firm has only recently filed a petition for an award of attorneys' fees. I later address the untimeliness and lack of merit of its petition.

10. Stearns, Weaver states that: "A proper application of the standards for the award of attorneys' fees compels an award of one third of the common fund (33 and 1/3 percent) less the two percent reduction proposed in connection with the motion to approve the settlement with Exxon. A total fee of 31.33 % of the common fund has been earned and should be awarded." [DE # 2637 at 13].

Pertnoy & Solowsky states: "Of the $1.075 billion that Exxon will pay under the Proposed Settlement, $15 million is specifically allocated to offset the fee obligation of the dealer plaintiffs in the three fee-shifting states (Arizona, Arkansas, and Texas). Accordingly, Class Counsel seek to recover their percent-

age award against only the $1.060 billion of the amount Exxon is paying, as only that comprises the 'common fund.' Before the Proposed Settlement, PSA previously requested a total fee award to Class Counsel of 33 1/3% of the gross sums recovered, and PSA now requests a total fee award to Class Counsel of 31 1/3% of the common fund. This 2% reduction acknowledges the lessened risk arising from the Proposed Settlement with respect to the legal services that must continue to be provided in the claims process." [DE # 2636 at 4 n. 4].

11. In the initial portion of this Order, I refer to "Class Counsel" and the "Class Representatives" collectively and make no distinction among them as to their contribution or scope of work. I do this for convenience. The allocation issue is addressed in other sections of this Order.

Representatives. I then discuss and resolve issues of allocation and payment.

## 2. Case History

This is a unique class action suit with a long history.[12] As suggested by Stearns, Weaver, it is fair to say that nearly all federal class actions end by dismissal, summary judgement, or settlement. Few are resolved by trial. Fewer still are decided by an appellate court. Almost none reach the Nation's highest court. None that I can find have involved a comprehensive claims administration process that has been so highly contentious. None has resulted in a settlement after trial and appeal whereby, at the end of the day, over 11,000 Class Members will receive full compensation of their claims, including nearly all of their prejudgment interest. This class action is the exception to every one of these particulars.

### a. The Complaint and Exxon's Defenses

This class action was brought by several Exxon dealers (the "Plaintiffs") on behalf of themselves and on behalf of all Exxon direct served dealers who purchased motor fuel from Exxon during the period March 1, 1983 until August 28, 1994. The Plaintiffs alleged that Exxon was contractually obligated to reduce the wholesale price of motor fuel by an amount that, on average, offset the credit cost recovery fees charged by Exxon in connection with its Discount for Cash program. They further alleged that Exxon had breached that obligation,

causing its dealers damages in an amount equal to the credit cost recovery fees collected during the Class period. Plaintiffs also sought the recovery of prejudgment interest based on the laws of the 35 states in which Exxon marketed motor fuel through direct served dealer service stations.

Exxon vigorously defended the claims, asserting that it had no legal obligation to offset credit fees with wholesale price reductions but it had done so in any event by virtue of the competitive nature of the marketplace. Exxon also sought to limit or bar individual class member claims through the application of statutes of limitation, thousands of form releases signed by terminated dealers, and by the superceding contract clause of the standard form sales agreement. Exxon opposed class certification although it was later granted. It then sought review of class certification by the United States Court of Appeals for the Eleventh Circuit Court which was rejected.

The most apparent feature distinguishing this class action from virtually every other class action in the reported federal decisions is obviously that it did not settle before .trial. Prior to trial, there were extensive discovery battles, extensive class certification briefings, at least six motions to dismiss, another ten summary judgment motions on different issues, an extraordinary number of motions *in limine*, and a week-long *Daubert* hearing. In addition, the Court required the parties to extensively brief the manner and method by

---

12. A full history of this case may be reviewed in the April 21, 1998 *Order Denying Exxon's Motion for Summary Judgment on Count I* (Kehoe, J.) [DE # 908]; *Allapattah Servs. Inc. v. Exxon Corp.*, 61 F.Supp.2d 1300 (S.D.Fla. 1999); *Allapattah Servs. Inc. v. Exxon Corp.*, 61 F.Supp.2d 1308 (S.D.Fla.1999) (setting forth the essential facts of the dispute); *Allapattah Servs. Inc. v. Exxon Corp.*, 61 F.Supp.2d 1326 (S.D.Fla.1999); *Allapattah*

*Servs. Inc. v. Exxon Corp.*, 188 F.R.D. 667 (S.D.Fla.1999); *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F.Supp.2d 1291 (S.D.Fla.2001); *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F.Supp.2d 1344 (S.D.Fla.2005); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir.2003), rehearing *en banc* denied, 362 F.3d 739 (11th Cir.2004), *affirmed, Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005).

which the case would be tried, with particular attention to the form of verdict the jury would consider. To say the least, the pretrial work in the case was substantial.

### b. The Jury Finds Liability and Breach and Awards Damages on a Cents Per Gallon Basis.

The case was first tried in 1999 but the jury deadlocked and was unable to reach a verdict. At the second trial in 2001, the jury found for the Class on each disputed issue. The jury found that Exxon had a contractual obligation to offset credit fees with wholesale price reductions, that Exxon breached that obligation, and that the Class of dealers suffered money damages measured on a cents per gallon basis (on average, 1.3 cents per gallon). The jury found that Exxon could not enforce the statutes of limitation because it had fraudulently concealed its breach. This Court rejected Exxon's attempt to limit or deny claims through the superceding contracts clause or releases. This Court also found that Exxon was liable for prejudgment interest based on the laws in each of the 35 states in which Exxon direct served dealer stores were located.

Following the jury's verdict, the Class requested entry of an aggregate final judgment for the full amount of money owed to the Class. This Court denied the request, finding instead that each class member would be required to establish individual damages, based on gallons purchased by filing a claim establishing ownership of a particular station during a particular time period. By virtue of this ruling, Exxon was only obligated to pay Class Members who filed a timely claim in the Claims Administration Process.

### c. The Jury's Verdict and District Court Rulings are Affirmed on Appeal

Exxon appealed to the Eleventh Circuit, challenging the jury's verdict and this Court's orders certifying the Class, rejecting the releases and superceding contract defenses, awarding prejudgment interest, and exercising jurisdiction over claims less than $50,000.00. The Class appealed this Court's order denying entry of an aggregate judgment for the Class.

The Eleventh Circuit rejected both sides' appeals, thereby affirming the jury verdict and the entitlement of each class member to damages in the Claims Administration Process. Exxon's and the Class' requests for rehearing before the Eleventh Circuit were denied.

The United States Supreme Court heard oral argument on March 1, 2005, and on June 23, 2005, rendered its decision affirming this Court's exercise of jurisdiction over the claims of all members of the Class. The Eleventh Circuit's opinion was upheld on the merits.

### d. The Claims Administration Process and Notice of Request for Attorneys' Fees and Incentive Awards

After trial and while the appeals were still pending, this Court implemented a Claims Administration Process for the purpose of processing individual class member claims for their respective share of the Class recovery. The Court approved a form of notice to the Class requiring each eligible class member to file a formal claim with the Claims Administrator by December 1, 2004. The notice advised that each claimant was required to pursue that claim in an adversary damages proceeding against Exxon. Exxon was entitled to participate in the Claims Administration Process, file objections to the payment of individual claims and, where appropriate, file claims for set-offs against damages. The notice further advised that Class Counsel was seeking an award of attorneys' fees not to exceed thirty-three and

one-third percent of each damage award, and that the Class Representatives were seeking incentive awards. Objections to the proposed fees and incentive awards were to be filed by August 31, 2005.

During the Claims Administration Process, Class Counsel has, on behalf of the Class, participated in three distinct phases, the first being collection, digitizing and coding of all dealer records from Exxon's files, the second being the location of Class Members or their beneficiaries wherever they might be to advise Class Members of their right to collect these funds and assist Class Members in filing claims, and the third being the advancement of individual claims on a claim by claim basis to final judgment. To manage the process of receiving, reviewing and approving these claims for payment, this Court appointed former United States District Judge Thomas Scott as Special Master and the Garden City Group, Inc. as Claims Administrator.

### e. Exxon Objects to All the Claims Filed, Asserts Set–Offs and Threatens More Appeals

More than 11,000 claims were filed with the Claims Administrator by the claim filing deadline of December 1, 2004. In response, Exxon filed an objection to every claim, asserting that each class member's entitlement to recovery of damages and interest had yet to be resolved through the trial and appeals. Exxon announced its intention to appeal any judgment entered in the Claims Administration Process and challenge, again, the damages and interest determined at trial and in this Court's prior orders. Moreover, Exxon filed thousands of "set-off" claims in which it alleged that the DFC claim should be either reduced or eliminated altogether because of monies owed by former dealers to Exxon for such things as money paid upon signing releases, fuel, accessories, rent or advances for station improvements.

Class Counsel moved to sanction Exxon for these objections and sought an order prohibiting Exxon from taking further appeals of any issues previously decided at trial and later affirmed on appeal. This Court granted the motion and entered an order which (1) sanctioned Exxon, (2) restricted the objections Exxon could assert in the Claims Administration Process, and (3) narrowed the scope of Exxon's set-off claims. I ruled that, if Exxon filed appeals on matters previously decided, I would impose upon Exxon, as a sanction, a post-judgment interest rate equal to Exxon's internal rate of return, which was 23.8% at the time the sanctions order was entered. *See Allapattah Servs., Inc. v. Exxon Corp.,* 372 F.Supp.2d 1344 (S.D.Fla.2005).

Exxon announced that it intended to appeal the sanctions order limiting its right to take further appeals. In addition, Exxon continued to object to almost every claim filed in the Claims Administration Process, requiring Class Counsel to assist every claimant in establishing the bona fides of their claim. Exxon also continued to assert approximately 650 set-off claims for damages totaling in excess of $40 million dollars exclusive of interest.

Class Counsel moved for judgment against Exxon on all of the set-of claims. The Special Master recommended allowing these claims, and Class Counsel's appeal of that order to this Court was pending when settlement was proposed.

### f. Class Counsel's Effort to Categorize Claims to Facilitate Claims Administration Up Through the Date of the Settlement Proposal

Up through the date of the settlement proposal, Class Counsel sought to advance the approximately 11,000 claims in an order that was based on the nature of the objection that had been asserted. The first claims to be considered were those

few hundred claims to which Exxon asserted minimal objections. Those claims to which Exxon's objections could be resolved through moderate revision to the claim were to be processed next, followed by those for which Exxon's objections raised significant legal or factual issues involving ownership (e.g. dissolutions, bankruptcies, heir issues, and assignments).[13]

### g. State Governments Claim on Behalf of Claimants Who Did Not File Claims

Relying on state abandoned property statutes, twenty-one of the thirty-five states in which Exxon dealerships were operated filed claims against Exxon asserting entitlement to recover the unfiled claims on behalf of the claimants who did not timely appear. At least one state that did not file directly in the Claims Administration Process advised Exxon and this Court that it intended to exercise the right to bring claims against Exxon on behalf of dealers who did not do so outside of this action. If state claims were allowed and the states recovered payment on behalf of absent Class Members, the states would hold the recovered money in trust for the true owner.

Exxon objected to the states' assertion of claims on behalf of Class Members who failed to timely do so. The Special Master and this Court had not resolved, by the date of the announced settlement, the issue of whether the states were entitled to assert claims for absent Class Members.

### h. Motions for Entry of Individual Judgments and Potential Further Appeals

Since July 5, 2005, Class counsel weekly filed motions seeking summary judgment on claims to which there is alleged to be no remaining evidentiary dispute with Exxon. The process was in its early stages when settlement was announced. As of December 19, 2005, twenty-two motions for summary judgment were filed with respect to approximately 1,300 claims for a total of approximately $330 million dollars. Of these, the Special Master already adjudicated 20 motions for summary judgment, thereby posturing some $276 million in class member claims for immediate distribution [DE # 2757 at 2].

### i. The Court's Rulings on Class Members' Obligation for Payment of Attorneys' Fees.

To facilitate the award of attorneys' fees, I ruled (prior to the announced settlement) that with respect to Class Members whose stations were located in states other than Texas, Arizona, and Arkansas, Class Counsels' attorneys' fees were to be paid by deducting from each Class Member's payment a fixed percentage to be later determined.[14] With respect to Class Members whose stores were located in Texas, Arizona or Arkansas, I further ruled that

---

**13.** Nearly 200 claims were filed after the December 1, 2004 claim filing deadline. Exxon moved to strike and deny all such late-filed claims. The Special Master recommended entry of an order permitting some and disallowing others, including barring any claim that was filed after April 27, 2005. Class Counsel had appealed that recommendation, which remained pending at the time of the announced settlement.

In addition, following certification of the Class and prior to trial, Exxon dealers were given the opportunity to "opt out" of the Class. A number of dealers did so. Since the favorable outcome, however, some of the dealers who opted out of the Class have filed claims or expressed a desire to be allowed to do so. Exxon objected to these claims, asserting that the claims of all dealers who opted out are barred as a matter of law.

**14.** The reasons behind the ruling are now set forth in this Order.

the laws of those states entitle those Class Members to require Exxon to pay at least a portion of their attorneys' fees in addition to its obligations to pay damages and prejudgment interest. Exxon announced that it intended to appeal that order. It argued that any liability for these attorneys' fees should be measured by a different criterion than that applicable to the percentage awarded for attorneys' fees in the other thirty-two states.

### j. Terms of the Settlement

The following is a summary of the terms of the settlement: [15]

### 1. Settlement Fund and Exxon's Waiver of Objections and Appeals

Exxon will wire funds in the amount of $1,075,000,000 (the "Total Settlement Proceeds") to an account at a banking institution approved by the Court (hereinafter, the "Exxon DFC Class Action Account" maintained at the "Exxon DFC Depository Institution"). Of this amount, $1,060,000,000 will be designated for payment of claims (the "Settlement Fund") and $15,000,000 will be designated for partial payment of the attorneys' fees owed by Exxon for Class Members whose stores were located in the states of Arkansas, Arizona, and Texas (the "Three State Fund"). Upon final approval of the agreement, Exxon waived and relinquished all objections and appeals to all claims. Exxon will no longer participate in the claims adjudication process, except that Exxon will be available to respond to inquiries by Class Counsel regarding the need for additional documentation.

### 2. Release to Exxon

Exxon will be released and discharged from any and all further liability for any and all causes of action, judgments, liens, indebtedness, costs, damages, obligations, attorneys' fees, losses, claims, liabilities and demands of whatever kind or character that are related to the cause of action that was adjudicated in this lawsuit.

### 3. Claims Administration Process

The Claims Administration Process will go forward before the Special Master to adjudicate each Proof of Claim that was postmarked on or before December 19, 2005, including those claims that were filed after the claims filing deadline of December 1, 2004 and including those claims that were filed by members of the Class who previously had opted out (if they filed claims prior to December 19, 2005).

Throughout the duration of the Claims Administration Process, Class Counsel will remain responsible for designating and presenting all claims for adjudication before the Special Master on a rolling basis, marshaling the supporting documentation that may be available for each claim, and identifying those gallons as to which there are competing claims requiring adjudication.

### 4. Two Percent (2%) Reduction and Five Percent (5%) Reserve from Claims

Each claim filed by a claimant by December 19, 2005 will be reduced by two percent (2%) as a reserve for contingent circumstances. In addition, when a claim is ordered to be paid, a five percent (5%) reserve will be taken from each claim to ensure that sufficient funds will exist at the end of the Claims Administration Process to fund all claims timely filed by December 19, 2005 and determined to be valid. Payment of that reserve will be made only if sufficient funds exist at the

---

**15.** Not all of the terms of the Settlement Agreement are included. Only the significant terms are discussed for the purposes of evaluating the results achieved.

end of the Claims Administration Process to allow it to be paid and only in the amount of the funds then available. The funds reserved and not paid will not bear interest. Thus, until the end of the Claims Administration Process, claimants will be paid 93% of their awarded recovery less deductions for attorneys' fees, costs, expenses and incentive awards. Class Member's actual recovery would depend on this Court's award of attorneys' fees to Class Counsel.

### 5. Termination of prejudgment interest and funding of costs of Claims Administration Process

Effective October 31, 2005, prejudgment interest will cease to accrue on all claims. Instead, the interest that accrues on the money held in the Exxon DFC Class Action Depository Account will be utilized to fund the costs of the Claims Administration Process, including the payment of fees of the Special Master, the fees of the Claims Administrator, the fees of the attorney(s) appointed on behalf of the state governments as discussed below, and all bank and transaction fees (collectively, the "Claims Adjudication Costs").

### 6. Exxon's Set–Off Claims Abandoned

All of the thousands of set-off claims raised by Exxon in the Claims Administration Process will be dismissed with prejudice.

### 7. Appointment of States' Counsel; Residual Funds Go to the States as Abandoned Property

(i) Exxon's departure from the Claims Administration Process will eliminate a role that it has previously filled—screening claims to challenge invalid claims in the Claims Administration Process. Class Counsel cannot fulfill this role because it cannot take a position adverse to claiming Class Members. The Claims Administrator, Garden City Group, also cannot fulfill

this role because it is acting in a neutral capacity as an arm of the Court, as is the Special Master. The state governments of the 35 states who have an unresolved claim to any monies not claimed by Class Members in the Claims Administration Process, however, have a sufficient interest and the proper incentives to fulfill this role. In particular, under the various states' abandoned property laws, the states will hold any unpaid funds they recover for the benefit of the true owner and thus have no incentive to needlessly oppose or unduly delay payment of valid claims.

(ii) To fill the role, the state governments collectively retained attorneys who will fully participate in the Claims Administration Process, have standing to object to claims, assist in the resolution of conflicting claims, and facilitate the settlement of disputed claims (which settlements will resolve with finality the right to claim the gallons at issue). In the event the states cannot agree on counsel to serve in this capacity, states' counsel will be appointed for all states by the District Court States' counsels' attorneys' fees and expenses, as approved by the Special Master and District Court, shall be paid from the interest income earned on the Exxon DFC Class Action Depository Account.

(iii) Any money remaining in the Settlement Fund or the Three State Fund after adjudication and payment of all claims (including payment in full of the 5% reserve from adjudicated claims, litigation expenses, and Claims Adjudication Costs) will be disbursed *pro rata* to the 35 state governments in which the Class member stations were located. This money will be held in perpetuity by the state governments pursuant to their abandoned property statutes or law for the benefit of the rightful owner. Any class member who did not submit a Proof of Claim on or before December 19, 2005 will be able to

make a claim directly to the appropriate state government pursuant to the applicable abandoned property statute or law. The value of the claim will be derived from the difference between the amount of the residual fund and the total of all claims that were not timely asserted.

### 8. No Interpleader; Sole Venue for Claims

The settlement provides that all claims, including disputes between competing claimants, must be adjudicated under the jurisdiction of the United States District Court for the Southern District of Florida pursuant to the authority and supervision of the Court and cannot be interplead to other courts. Moreover, any and all third-party liens, garnishments, attachments, and other claims against Exxon must be brought as part of this litigation and cannot be brought against Exxon in any other court of law or jurisdiction.

### 9. Appeals From Claims Decisions Limited

Any party seeking to recover monies in the Claims Administration Process will be entitled to due process before a Special Master and review of any decisions following that process by appeal to the District Court. There will be no appellate review of decisions of the District Court with respect to claims decisions.

### 10. Authority of the States' Counsel to Recommend Discounts of Claims Where Disputed Legal or Factual Issues Exist

To facilitate the Claims Administration Process, the States' counsel will be empowered to recommend to the Special Master

agreed-upon discounts of claims in recognition of the risk of litigation of those disputes in the Claims Administration Process. The amount of any negotiated and approved discount will remain in the Settlement Fund to enhance the probability of excess funds in the Settlement Fund upon the adjudication of all claims.

### 11. Mediation

Where requested by the parties or ordered by the Special Master, parties to contested claims will be directed to mediation to attempt to resolve disputes.

## III. CLASS ACTION ATTORNEYS' FEE AWARDS

### A. Under United States Supreme Court And Eleventh Circuit Precedent, Class Counsel are Entitled to an Award of Fees Pursuant to the "Common Fund" Doctrine

█ The approved settlement has clearly established a "common fund" for the benefit of the Class.[16] Pursuant to the settlement, Exxon has contributed a sum certain to an account at a federal banking institution to be distributed in accordance with the terms of the settlement and pursuant to the further orders of this Court. Exxon is no longer responsible for the payment of any attorneys' fees (other than in three fee-shifting states). Here, the settlement provides all the attributes of a "common fund," namely, (1) the class of beneficiaries is sufficiently identifiable, (2) the benefits can be accurately traced to them, and (3) the fee can be shifted with some exactitude to those benefiting from the settlement.

---

**16.** Even without the settlement, I would have found a "common fund" based upon the collective filing of monies into the Court's escrow account following the entry of final judgments during the Claims Administration Process. I do not view that the "law of the case" doctrine would have precluded such a ruling. Neither I, nor the Eleventh Circuit, had directly dealt with this issue as it concerns attorneys' fees.

It is axiomatic that "attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval. Fed. R.Civ.P. 23(e)." *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir.1991). The district court presiding over a diversity-based class action pursuant to Fed.R.Civ.P. 23 has equitable power to apply federal common law in determining fee awards irrespective of state law. In addition, all of the states, with the possible exception of Florida, either recognize or have no contrary authority against the use of the percentage of the recovery method for the determination of a reasonable fee in such circumstances. *See* Attachment "1" to this Order (specifying the law of the applicable states). Under such circumstances, even Florida law [17] does not trump under an *Erie* analysis. *See, e.g., Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 522 n. 5 (1st Cir.1991)(recognizing that district court presiding over diversity-based class action has equitable power to apply federal common law in determining fee award irrespective of state law); *Mathewson Corp. v. Allied Marine Indus. Inc.*, 827 F.2d 850, 853 n. 3 (1st Cir.1987)(federal court settlement implicating matters of considerable federal concern requires resolution by federal common law principles as opposed to state law); *Perfect Fit Indus. v. Acme Quilting Co., Inc.*, 646 F.2d 800, 806 (2d Cir.1981)(federal court's equitable powers not governed by state law even when state law provides the rule of decision); *Clark Equip. Co. v. Armstrong Equip. Co.*, 431 F.2d 54, 57 (5th Cir.1970)(*Erie* doctrine does not deprive federal court in diversity case from power to employ equitable remedies not available under state law).

In fact, the United States Supreme Court has, since 1882, repeatedly recognized that, where counsel secures a "common fund" for the benefit of a class, counsel is entitled to be compensated from the funds recovered. *See Trustees v. Greenough*, 105 U.S. 527, 15 Otto 527, 26 L.Ed. 1157 (1882); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 392–94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Alyeska v. Pipeline Svc. Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Boeing v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The "common fund" doctrine is based on the perception that those who benefit from the prosecution of a lawsuit will be unjustly enriched if they do not share the costs in direct proportion to the benefit each receives. *See Boeing*, 444 U.S. at 478, 100 S.Ct. 745; *Camden*, 946 F.2d at 771.

An award of attorneys' fees from a common fund necessitates a final judgment or settlement fixing the total amount of damages and ordering such amount to be placed in an escrow account from which Class Members would receive their share simply by proving their individual claims against the judgment fund. *See Boeing*, 100 S.Ct. at 749–50, 100 S.Ct. 745 (". . . the criteria are satisfied when each member of a certified class has an undisputed and

---

17. *See Kuhnlein v. Dept. of Revenue*, 662 So.2d 309 (Fla.1995)(specifying lodestar with multiplier up to 5 for determination of common fund fee award in class action governed by Florida law). *Kuhnlein*, however, implicated none of the critical concerns warranting application of the percentage method in this case, including the proportionate sharing of costs in a class action arising under the laws of numerous jurisdictions and the need for a fair and efficient mechanism to compensate counsel in connection with an ongoing Claims Administration Process which continues in accordance with the Settlement Agreement.

mathematically ascertainable claim to part of a lump-sum judgment [or settlement] recovered on his behalf. Once the class representatives have established the defendant's liability and the total amount of damages, members of the class can obtain their share of the recovery simply by proving their individual claims against the judgment [settlement] fund. This benefit devolves with certainty upon the identifiable persons whom the court has certified as members of the class. **Although the full value of the benefit to each absentee member cannot be determined until he presents his claim, a fee awarded against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of the claim bears to the total recovery.**") (emphasis added).

This key requirement has now been met in this case. A fee award against the entire judgment fund will shift the costs of litigation to each Class Member in the exact proportion that the value of the claim bears to the total recovery. In this manner, each individual recovery is to carry its proportionate share of the total amount allowed for attorneys' fees, expenses and disbursements as such class member's recovery bears to the total recovery afforded the class. *See Boeing,* 444 U.S. at 478, 100 S.Ct. 745 (emphasis added); *see also Camden,* 946 F.2d at 771 ("common fund" doctrine permits an award of fees where the court's jurisdiction over the subject matter of the suit and the defendant "make[s] possible an award that will operate to spread costs proportionately among class members")(quoting H. Newberg, *Attorney Fee Awards,* § 2.01 at 28–29 (1986)); *In re Everglades Air Disaster,* 549 F.2d 1006, 1017–18 (5th Cir.1977)(affirming then District Judge Fay's order applying the "common fund" doctrine which provided for payment of fixed percentage of anticipated claim proceeds as fees).

**B. The Eleventh Circuit's Decision in Camden Applying the Common Fund Doctrine Requires Attorneys' Fees Awarded Thereunder To Be Established as a Percentage of the Recovery**

■ The Eleventh Circuit in *Camden* held that, in applying the "common fund" doctrine, class counsel's attorneys' fees are to be awarded as a percentage of the class' recovery, as opposed to a complex hours-based lodestar approach. *Camden,* 946 F.2d at 773–74. The *Camden* Court specified that, "henceforth, in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class. The lodestar analysis shall continue to be the applicable method used for determining statutory fee-shifting awards." 946 F.2d at 774.

The *Camden* Court further specified that, in determining such awards, the "bench mark" percentage is 25%, "which may be adjusted up or down based on the circumstances of each case." *Id.* at 775. This 25% "bench mark" arose in the context of a typical class action which had been settled prior to a trial for a fraction of the defendant's potential liability, thus mitigating counsel's risk of a negative outcome. The Court recognized that circumstances may be quite different in other cases and adopted a flexible approach to determining a percentage given all of the circumstances. Thus, for instance, in this case, contrary to *Camden,* Class Counsel bore the full risk of losing the case through trial, a direct appeal on the merits, a proceeding before the United States Supreme Court, and during the fluid circumstances of the Claims Administration Process.

■ Consistent with this approach, the Court held that, in considering adjustments, district courts should evaluate the

twelve "Johnson factors" (*Johnson v. Georgia Highway Expr., Inc.*, 488 F.2d 714 (5th Cir.1974)), with particular emphasis on the "monetary results achieved" in the case. The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability of the case"; (11) the nature and the length of the professional relationship with the client, and (12) awards in similar cases. 946 F.2d at 772 n. 3.

In addition to these factors, the Eleventh Circuit recognized that "[O]ther pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees required by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *Id.* at 775. Furthermore, it stated that there " . . . will also be additional factors unique to a particular case which will be relevant to the district court's consideration." *Id.* But, the Court stated that, as a general rule, 50% may be established as an upper limit. *See id.* at 774.

The Eleventh Circuit directed that, in order to facilitate appellate review, district courts should articulate the specific reasons for selecting the percentage awarded, including identification of the factors upon which it relied and how each factor affected the percentage awarded. *Id.* at 775.

The Court recognized that there are no hard and fast rules mandating the weight to be given to each factor and the percentage to be awarded. The Court further recognized that the factors which will impact upon the appropriate percentage to be awarded as a fee in any particular case will vary. *Id.*

In objections to the proposed award of attorneys' fees, counsel for Objectors Thomas Lee, Josephine Choi and Larry Freeland relies on the Eleventh Circuit's more recent decision in *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1291 (11th Cir.1999). This case, however, supports, rather than detracts, from my analysis of the factors set forth below. In *Waters*, the Court affirmed the district court decision that Class Counsel was entitled to a small upward adjustment in the benchmark of 30%, and that the appropriate percent should be 33 1/3% or $13,333,333.00. 190 F.3d at 1295. In that case, the settlement amount was $40 million (as compared to $1.075 billion here). *See id.* The settlement in that case was reached after seven years of extremely contentious litigation and five months of trial. *See id.* Here, the settlement was reached following fourteen years of contentious litigation, two jury trials, extensive appeals, and in the middle of an extremely contentious Claims Administration Process. Accordingly, the facts of this case are quite different from those in *Waters* and the ultimate percentage to be awarded " . . . may be adjusted in accordance with the individual circumstances of each case." *Waters*, 190 F.3d at 1294 (citations omitted).

## C. Consideration of the Johnson and Other Factors

### 1. Summary of Analysis and Conclusion [18]

**18.** An analysis of the *Johnson* factors overlaps, in part, with an analysis of the factors

I begin with the conclusion that the 25% "bench mark" should be considered a floor for a fee award in this case, and that the percentage should be adjusted upward in light of the application of the relevant *Camden/Johnson* factors. I do so with the confidence of presiding over this case in nearly all its significant details for over seven years. This was an "all or nothing" case for the Plaintiffs. Class Counsel, having worked on this case since 1992, faced a potential catastrophic risk in the event the case was lost at trial or, thereafter, at each level of review. Given the length of this case, and the significant risks inherent in the litigation, I conclude that the most appropriate way to establish a bench mark is by reference to the market rate for a contingent fee in private commercial cases tried to judgment and reviewed on appeal. *See Camden*, 946 F.2d at 772 n. 5 (referencing fifth and sixth *Johnson* factors regarding the customary fee in a particular case and whether the fee is fixed or contingent, emphasizing that each case's unique circumstances dictate relative importance of factors); *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir.2001)(requiring that "common fund" percentage awards be determined by market rate for contingency fee agreements on a prospective basis at the outset of the representation).

But, even this approach minimizes the risks involved for Class Counsel. After successfully defending the case at trial and on appeal, Class Counsel's entitlement to an attorneys' fee, including the total amount of the attorneys' fee, was directly dependent upon the number of Class Members who actually filed claims pursu-

ant to notice, and, further, upon the merit each of each claim, resulting in a final judgment for individual damages. I made this clear in my Order on Plaintiffs' Motion for Determination of Legal Basis and Responsibility for Payment of Attorneys' Fees [DE # 1721] which denied an "advancement" of attorneys' fees by Exxon. Confronted with this reality, Class Counsel undertook an extraordinary effort to contact Class Members and encourage the filing of claims. The result is now self-evident with over 11,000 claims (over 92%) being filed in this case.

Even with this success, Class Counsel was confronted with another major task. Given Exxon's unflagging defenses, each claim potentially required a "mini-trial" before the Special Master. Exxon made it clear that each final judgment would be subject to further appeal, notwithstanding that it potentially faced severe sanctions for its "unwarranted" defenses. This presented a unique and challenging task for the most committed of counsel who potentially had to wait until the end of the day to be compensated for years of excellent service.

Even after the settlement approval, Class Counsel remains responsible to pursue each claim to judgment. This will require Class Counsel (as later addressed) to place a large staff of attorneys, paralegals and other professionals to assist claimants in prosecuting their claims. They will stay in that role for the duration of the Claims Administration Process. No other attorneys' fees will be charged by Class Counsel for these services. By fully aligning Class Counsel's interest in attor-

set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984) which are considered for purposes of approving or disapproving a settlement in a class action lawsuit. As applied here, the *Bennett* factors are discussed at length in the Special Master's Amended Report and Recommendation on

the Class Settlement Agreement, pages 31–50 [DE # 2607] which I adopted by Final Order [DE # 2773]. I incorporate that Amended Report and Recommendation by reference in this Order to the extent it further elaborates on the *Johnson* related factors.

neys' fees with the maximum recovery for each Class member, the Class, as a whole receives a benefit, as compared to leaving each member on his or her own after the settlement. There is a price to the Class, however, for this full alignment of interest. In my view, the Class, and each Class Member, must be prepared to compensate Class Counsel at the full market rate for such past and present extraordinary services. Evidently, the Class itself recognized Class Counsel's remarkable services in that so few objections were filed to a percentage fee. The lack of significant objection from the Class supports the reasonableness of the fee request. *See Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir.1990) (even when 29 members of a 281 person class (i.e. 10% of the class) objected, the court concluded that the response of the class as a whole "strongly favors [the] settlement"); *In re Rite Aid*, 396 F.3d 294, 305 (3d. Cir.2005) (stating that the fact that only two class members objected to the fee request supports approval of the fee); *In re Rent-Way Sec. Litig.*, 305 F.Supp.2d 491, 514 (W.D.Pa.2003) ("[t]he absence of substantial objections by other class members to the fee application supports the reasonableness of Lead Counsel's request", thus indicating the strong support of the Class for the award of fees and expenses requested); *see also* Order of Final Approval of Class Settlement Agreement [DE # 2773 at 23–24 (citing cases on lack of objection) ].

As aptly stated by Professor Issacharoff, in his Declaration in Support of Attorneys' Fees:

[T]he resolution to date has resulted in the creation of a claims process whereby individual class members will press claims for compensation one at a time. In my view, the key task before the Court in setting attorneys' fees is to create the incentives that will maximize the amount of recovery to the class.

This is best accomplished by awarding class counsel a fee based upon a percentage of what the class recovers. Not only does that minimize any conflict between the class and class counsel, but it also rewards class counsel for recovering as much as possible for the class.

ISSACHAROFF DEC. ¶ 3 [DE # 2638, Exhibit "B"].

■ For these reasons, and the reasons set forth below, I conclude that the appropriate percentage to be awarded to Class Counsel is 31 and 1/3 percent. In reaching this conclusion, I am mindful that two of the law firms serving as Class Counsel, Steams, Weaver and Pertnoy & Solowsky, have proposed that the fee award should be reduced in consideration of the lessened risk arising from the settlement agreement. They do so in order that the 2% reduction in claims would be fully offset with fee reductions. I concur with their position and conclude that the totality of the findings support an award of 31 and 1/3 percent to Class Counsel.

### 2. Application of the Factors

I do not consider the *Johnson* factors in the order they are listed in that opinion. Instead, I have rearranged the order of each *Johnson* factor in terms of the priority and weight I have assigned to it.

### — Amount Involved and Results Obtained-

The eighth *Johnson* factor-"[t]he amount involved and the results obtained"-recognizes that a fee award should reflect the relief obtained. *Johnson*, 488 F.2d at 718. This corresponds to the United States Supreme Court's directive that an enhancement of the fee award is appropriate in cases of "exceptional success." *Blum v. Stenson*, 465 U.S. 886, 901, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Factors indicating "exceptional success" include success achieved under unusually difficult or risky circumstances and the size of

plaintiffs' recovery. *See Yates,* 719 F.2d at 1533 (enhancing fee in part because of the very favorable result for the plaintiff).

Regarding the most important factor, Class Counsel's performance establishes the highest level of achievement. *See* Silver Report at 51 (App.C)[DE #2638]. The gross settlement amount of $1.075 billion represents one of the largest settlements in class action history. *See* Silver Supplemental Report at 4–5 (App.-D)[DE #2638]. Plaintiffs prevailed on every claim and overcame every defense at trial and on appeal. Full and complete recovery was achieved on behalf of the entire Class and every individual Class Member.

In addition, by virtue of Class Counsel's successful dealer outreach program, they have also achieved an unprecedented claim response rate of 92% of the total gallons sold during the Class period. *See* Affidavit of Eugene Stearns, ¶8 (App.G)[DE #2638]. Class Counsel's outreach effort contributed significantly to this accomplishment. Before the settlement was negotiated, Class Counsel contacted Class Members and encouraged them to file claims. The 92% claims rate is unprecedented. *See* Supplemental Report of Charles Silver at 6–7 (App.-D)[DE #2638]. As noted by Professor Silver, "In the context of this case, where the class

had already prevailed at trial, this outreach effort presented Exxon with the very real prospect of having to pay almost the full value of the trial judgment to the class via the claims process." *Id.*

As stated by Professor John Coffee of Columbia University (the foremost academic scholar on class action attorneys' fees awards whose initial law review articles on the "common fund" doctrine provided the impetus for the conclusions of the Third Circuit Task Force and the Eleventh Circuit in adopting the percentage method), the result obtained in this case is truly extraordinary. "No other action that I have seen approaches this one in the degree of success obtained for the class, the effort expended by class counsel, or the risk assumed." Coffee Declaration, ¶2 (App.A)[DE #2638].

In a supplemental affidavit filed after the settlement, Professor Coffee expanded upon his view of the accomplishments in this case, observing that the effect of Class Counsel's efforts post-settlement will substantially enhance the recoveries by claimants in the Claims Administration Process. Supplemental Coffee Declaration at 3–4 (App.-B)[DE #2638]. I concur with this observation (and those of Professor Silver) and give this factor very significant weight.[19]

---

**19.** Professor Coffee notes: "That this settlement with Exxon was achieved again seems principally attributable to the efforts of class counsel. Class counsel's efforts in this regard included: (1) achieving a 90% claims filing rate, (2) successfully soliciting 21 or 35 class state governments to file claims under their respective abandoned property statutes for monies not claimed by class members (thereby signaling to Exxon that it would not necessarily benefit by contesting claims), (3) obtaining an order from the District Court sanctioning Exxon for bad faith in impeding the claims process by re-asserting defenses already resolved at trial; and (4) vigorously pursuing the Claims Administration Process by presenting a series of summary judgment motions on individual dealer claims before

the Special Master, of which some $200 million in claims have already been approved for payment and another $150 million are in the pipeline for entry of judgment. Faced with this pressure and the risk of sanctions, Exxon appears to have-at last-ended its scorched earth campaign." Supplemental Coffee Declaration at 3 (App.-B) [DE #2638].

Another leading authority in this area of the law, University of Texas Law School Professor Charles Silver, joins Professor Coffee in praise of this accomplishment: "Because it so closely resembles the best possible outcome of litigation, this settlement achieves a nearly unique combination of large absolute dollars recovered ($1.075 billion) and a high percentage of the dollars Class Dealers are thought to

### — Novelty and Difficulty-

The second *Johnson* factor recognizes that attorneys should be appropriately compensated for accepting novel and difficult cases. *Johnson,* 488 F.2d at 718. Courts in this Circuit recognize that large class actions involving various legal theories are, by their nature, very difficult. *See Yates v. Mobile County Personnel Bd.,* 719 F.2d 1530, 1535 (11th Cir.1983)(extremely complicated litigation requires thorough and detailed research of almost every question involved); *Behrens,* 118 F.R.D. at 547 (observing that the size of the class, the difficult theories of liability, and the always-troublesome problems associated with damages demonstrated that the case was an awesome and complex matter masterfully handled by plaintiff's counsel); *R.C. by Alabama Disabilities Advocacy Program v. Nachman,* 992 F.Supp. 1328, 1334 (M.D.Ala.1997) ("The size of the class and the nature and scope of the relief are among the factors that contribute to complexity and difficulty of this case.")

The factual and legal framework out of which this case arose made it an extraordinarily difficult case, which required great legal skill to achieve the unprecedented outcome. Indeed, until the verdict obtained in this case, the oil companies had been universally successful in defeating dealer pricing claims generally, and discount for cash claims particularly. *See, e.g., Ajir v. Exxon Corp.,* 1999 WL 393666, at *1 (9th Cir. May 26, 1999); *Havird Oil Co. v. Marathon Oil Co.,* 149 F.3d 283 (4th Cir.1998); *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.1986); *Au Rustproofing Ctr. v. Gulf Oil,* 755 F.2d 1231 (6th Cir. 1985); *T.A.M. v. Gulf Oil,* 553 F.Supp. 499 (E.D.Pa.1982); *Abbott v. Amoco Oil Co.,* 249 Ill.App.3d 774, 189 Ill.Dec. 88, 619 N.E.2d 789 (1993). In addition, franchisors have typically been successful in avoiding liability in class claims brought by their franchisees because of the legal and factual difficulties inherent in attempting to establish duty, liability and damages on a uniform basis as to the class as a whole. *See, e.g., Broussard v. Meineke Discount Muffler Shops,* 155 F.3d 331 (4th Cir.1998); *Hall v. Burger King Corp.,* 1992 WL 372354 (S.D.Fla. Oct.26, 1992) (denying class certification to putative class of franchisees).

The legal difficulty of this case was further compounded by the application of state law to numerous issues which repeatedly required surveys and reconciliations on numerous legal issues across the laws of 36 states, including issues relating to the application of contract law, the Uniform Commercial Code, releases, statutes of limitation, fraudulent concealment and prejudgment interest. Class Counsel also prevailed on the issue of supplemental jurisdiction from this Court all the way to the United States Supreme Court, a complicated and contentious issue of law that has deeply divided the circuit courts of appeal and the Supreme Court since the supplemental jurisdiction statute was enacted in 1991.

On top of the legal difficulties was the economic complexity of the downstream petroleum marketplace and the staggering volume and intricacies of Exxon's wholesale, retail, and margin databases which tracked these data on a daily basis across 3 grades of gasoline in 70 to 80 markets in 36 states over a 12 year period. While

have lost (approximately 98%). Settlements with enormous dollar values tend to recover a small fraction of claimants' losses, and settlements that recover high percentages of claimants' losses tend to involve total dollars that are fairly small. By winning a nearly complete recovery in an enormous case, Class counsel have achieved a rare accomplishment." Supplemental Report of Charles Silver at 6–7 (App.-D)[DE # 2638].

Exxon had full mastery of its systems and these facts at the outset of the case, Plaintiffs did not.

For example, Exxon's wholesale pricing database was provided to Plaintiffs on IBM mainframe computer tape drives in an archaic computer language "APL", that few modern day programmers have even heard of. After converting the data, at great expense and effort, to a modern computer language, and cabling together a series of desktop computers to load and query the database which was too large to run on a single computer, Class Counsel obtained access to Exxon's pricing information and began to unravel the mysteries of Exxon's pricing practices. At Class Counsel's request, Exxon produced millions of documents in discovery, which its senior officer jokingly referred to at trial as having been written in a foreign tongue—Exxoneese. In order to decipher their meaning, Class Counsel repeatedly analyzed and synthesized these documents, ultimately enabling Plaintiffs to prove their case at trial with Exxon's own words, which points up yet another difficulty in proving this case.

Not only did Plaintiffs have to prove the case on a uniform basis as to all dealers across all markets throughout the Class period, they had to do so based almost exclusively on the testimony of Exxon's own witnesses. Proving a direct case based on cross-examination of the opposition is no easy feat, but through extraordinarily detailed pre-trial analysis and preparation, Class Counsel was able to prove Exxon's wrongs through its own words, documents and testimony.

Further adding to the difficulty of the case was the quality of Plaintiffs' legal adversaries. Exxon hired some of the most able lawyers and experts in America and spared no expense in doing so. Exxon was represented by its long time counsel, the Washington firm of Howrey &

Simon, which had lengthy experience in petroleum marketing litigation. Howrey deployed multiple lawyers in this case to argue every conceivable legal and factual issue. Exxon also hired Miami trial lawyer Larry Stewart, former president of the American Trial Lawyers' Association, and one of the most respected trial lawyers in Florida. Post trial, Exxon hired Carter Phillips, of Sidley & Austin, reputed to have one of the best Supreme Court practices in the country, and also retained the respected nationwide firm, Hunton & Williams, and another respected Miami firm, Burlington Weil, to represent it in the Claims Administration Process. In addition, Exxon hired the renowned, full time testifying expert, Harvard economist Joe Kalt, and his consulting firm ERG, who have heretofore been universally successful in rationalizing the wrongful behavior of oil companies. Professor Kalt's skill as an articulate, unflappable, and knowledgeable expert on the witness stand was evident at trial.

During the course of this case, Class Counsel also created and implemented new and cutting edge trial techniques that greatly assisted jury comprehension of this complex case. All jurors were provided notebooks containing the important trial exhibits which the jurors conscientiously and consistently reviewed during trial. Class Counsel also developed the ability to scan, store, and project on a twenty foot screen assembled in the courtroom the Exxon business records and demonstrative exhibits that proved Exxon's breach. These images could not only be highlighted, underlined, excised, or blown-up, but, in addition, witnesses on the witness stand could use a light pen to mark and write on the images to aid their testimony for the jury. Class Counsel also introduced the use of digitized videotape depositions to be projected onto the large screen in the

courtroom for purpose of both deposition designations and impeachment.

Class Counsel continued to overcome all hurdles to success presented by the rigorous appellate process by obtaining affirmance of the jury verdict and class certification in the Eleventh Circuit and affirmance of the Court's subject matter jurisdiction over the entire Class in the United States Supreme Court. Class Counsel have continued their ground breaking work in the Claims Administration Process by deploying large numbers of staff to cull Exxon's extraordinarily voluminous dealer files, extract and code the relevant information, create the systems required to locate missing dealers and establish the bona fides of individual dealer claims, and otherwise spearhead the effort to develop and get the Claims Administration Process underway. Class Counsel have done so [pre-settlement] in the face of continued Exxon intransigence which led, on Plaintiffs' motion, to this Court's entry of a sanctions order that deters Exxon from taking frivolous appeals in order to further delay payment by imposing post-judgment interest at Exxon's internal rate of return rather than the federal low post-judgment rate.

### -Requisite Skill-

The third *Johnson* factor is the "[t]he skill requisite to perform the legal service properly." *Johnson*, 488 F.2d at 718. This factor ties directly to the second *Johnson* factor and requires the judge to "closely observe the attorney's work product, his preparation, and general ability before the court." *Id.* The Eleventh Circuit recognizes skill as the "ultimate determinate of compensation level," as "reputation and experience are usually only proxies for skill." *Norman*, 836 F.2d at 1300.

In *Norman*, the Eleventh Circuit listed several elements that district courts may consider in determining an attorney's skill.

836 F.2d at 1300. First, the Court explained that skill may be measured by evaluating the degree of prudence and practicality exhibited by counsel at the beginning of the case. *See id.* Second, skill may manifest itself through arduous preparation and efficient organization, particularly if the case goes to trial. *See id.* Next, the Court explained that an attorney who has a sharp command of trial practice and a sound understanding of the substantive law, governing the case, such that his time may be spent exploring the finer points raised by the issues, should be compensated at a higher rate of pay than one who has to educate himself just to gain a general working knowledge of trial practice and law. *See id.* at 1301. Finally, the Court noted that persuasiveness is an attribute of legal skill and defines a good advocate as one who advances his client's position in a clear and compelling manner. *See id.* The Eleventh Circuit also explained that the complexity of the case at hand may indicate skill. *See Yates*, 719 F.2d at 1535 (recognizing that the extreme complexity of the proceedings, as well as the significant factual difficulty of the case, required considerable skill by lawyers for the plaintiff).

Applying these factors, I conclude, without hesitation, that Class Counsel have proven themselves to be highly skilled. The complexity of this litigation, the size of the class, the need for two trials, and Exxon's position to fight the dealer plaintiffs on virtually every single issue, required considerable skill by Class Counsel, particularly when coupled with the complexity of the extraordinary Claims Administration Process. I recognize the sheer logistical challenge of coordinating and administering a case involving over 10,000 dealers and the laws of 36 jurisdictions. In evaluating the skill involved, I also consider the quality of Class Counsel's opposition. *Sunbeam*, 176 F.Supp.2d at 1334

("[I]n assessing the quality of representation, courts have also looked to the quality of the opposition the plaintiffs' attorneys faced...."). For reasons I noted above, I give significant weight to this *Johnson* factor as well.

### -Customary Fee in Contingent Commercial Litigation-

The fifth *Johnson* factor is "[t]he customary fee for similar work in the community." *Johnson*, 488 F.2d at 718. A fee of 31 and 1/3% to Class Counsel is well within the range of customary fees. Professor Issacharoff, Pertnoy & Solowsky's expert, supports this view:

> It is my further opinion that the percentage amount of attorney's fees sought here (sic) one-third of the gross recovery is in line with what is typically awarded in comparable cases. A total fee of one-third of the total class recovery is in line with the expectations of the class, as apparently reflected in the individual retainer agreements of the class representatives. Such an award is especially justified in that class counsel will have to further defend the interests of individual class members in the claims process.

ISSACHAROFF DEC. ¶ 4 [DE # 2638, Exhibit "B"].

*See also* Coffee Declaration ¶¶ 6 & 27 (App.-A) [DE # 2638]; Silver Report at 32 (App.-C) [DE # 2638]; Theodore Eisenberg and Geoffrey Miller, *Attorneys Fees in Class Action Settlements an Empirical Study*, 1 Journal of Empirical Legal Studies at 12 n. 15 (2004)(App.-J)[DE # 2638].

### — Preclusion of Other Employment-

The fourth *Johnson* factor is "[t]he preclusion of other employment by the attorney due to acceptance of the case." *Johnson*, 488 F.2d at 718. This factor requires the dual consideration of otherwise available business which is foreclosed because of conflicts of interest arising from the representation, and the fact that once the employment is undertaken, the attorney is not free to use the time spent on the case for other purposes. *See id.; see also Yates*, 719 F.2d at 1535 (determining that this factor should raise the fee award because the expenditure of 1,000 billable hours necessarily had some adverse impact on the attorney's ability to accept other work).

The substantial investment of resources demanded by the prosecution of this case in both attorney time and the investment of out-of-pocket expenses cost Class Counsel not only the revenue it would have ordinarily derived from its traditional hourly billing practice, but also precluded Class Counsel from otherwise concentrating and expanding its practice with its existing client base and with respect to potential new clients. Taking on this resource-sapping, risk-based venture also precluded Class Counsel from accepting other contingent matters during the period of representation.

### — Experience, Reputation, and Ability of Attorneys

The ninth *Johnson* factor is "[t]he experience, reputation, and ability of the attorneys." *Johnson*, 488 F.2d at 718. Courts in this circuit routinely emphasize this factor in calculating percentage fee awards. *See, e.g., Yates*, 719 F.2d at 1535 (noting that the magistrate judge was familiar with the experience, reputation and ability of the lawyers and that the lawyers were justifiably held in high esteem); *Ressler*, 149 F.R.D. at 655 ("The standing and experience of plaintiff's counsel was an important factor in the settlement of this action ... [t]his jury and appellate experience has earned the respect of defense counsel and no doubt contributed to the efficient prosecution and the settlement of this action.").

Class Counsel who have worked on this case are talented and experienced attorneys with excellent reputations in the legal community. I conclude this is a very strong factor in favor of the percentage sought. After seven years, I am very familiar with the quality and representation of Class Counsel. I need not belabor this point.

### — Awards in Similar Cases

The last *Johnson* factor considers "[a]wards in similar cases." *Johnson,* 488 F.2d at 719. This factor dictates that the reasonableness of a fee "may also be considered in light of awards made in similar litigation within and without the court's circuit." *Id.* There are no reported cases similar to this one. Coffee Declaration ¶ 2 (App.-A)[DE # 2638]; Silver Report at 50–51 (App.-C)[DE # 2638]. In the typical federal court class action, class counsel settles early on for literally cents on the dollar, eliminating their risk of nonpayment in exchange for nominal recovery for their clients. Coffee Declaration ¶ 23 (App.-A)[DE # 2638]; Elaine Buckberg, et al., *Recent Trends in Securities Class Action Litigation: Are Worldcom and Enron the New Standard?* at 6 (NERA July 2005) (App.-J)[DE # 2638](since 2002, average securities class action settles for less than 3% of investor losses). Few class actions ever reach trial. *See Waters,* 190 F.3d at 1299. Fewer still result in a jury verdict for the class that is affirmed on appeal.

No class action of which I am aware has approached the remarkable recovery achieved in this case, through two trials, a jury verdict, a direct appeal, and an appeal to the United States Supreme Court. Coffee Declaration ¶ 2 (App.-A)[DE # 2638]; Silver Report at 11–12 (App.-C) [DE # 2638]. Nor has any class action of this magnitude seen a remotely comparable claims response rate, or required a more dedicated effort on the part of Class Coun-

sel to complete the Claims Administration Process. The results achieved in this case, and the obligations imposed upon Class Counsel going forward, are simply unprecedented.

Accordingly, I conclude that decisions involving fee awards in class action settlements should not control the determination of an appropriate fee award in this case. On the other hand even many of those decisions have approved fee awards comparable to or higher than that requested here.

In particular, federal district courts across the country have, in the class action settlement context, routinely awarded class counsel fees in excess of the 25% "benchmark," even in so-called "megafund" cases. Coffee Declaration ¶¶ 14–20 (App.-A) [DE # 2638]; Silver Report at 42–48 (App.-C)[DE # 2638]. A few examples include:

| Case | Year | Cash Recovery | Fee Award (%) |
|---|---|---|---|
| *In re Brand Name Drugs* | 2000 | $696M | 25.4% |
| *In re Vitamins* | 2001 | $365M | 34.6% |
| *In re Busporine* | 2003 | $220M | 33⅓% |
| *In re Linerboard* | 2004 | $202M | 30% |
| *In re Lease Oil* | 1999 | $190M | 35.1% |
| *In re Relafen* | 2004 | $175M | 33⅓% |
| *In re Sumitomo* | 1999 | $132M | 28.3% |
| *Kurzweil* | 1999 | $123M | 30% |
| *In re Cardizem* | 2002 | $110M | 30% |

*See In re Linerboard Antitrust Litig.,* 2004 WL 1221350 (E.D.Pa. June 2, 2004); *In re Relafen Antitrust Litig.,* No. 01–12239–WGY (D.Mass. Apr. 9, 2004); *In re Busporine Antitrust Litig.,* No. 01–MD–1410 (S.D.N.Y. Apr. 11, 2003); *In re Cardizem CD Antitrust Litig.,* No. 99–73259 (E.D.Mich. Nov. 25, 2002); *In re Brand Name Prescription Drugs Antitrust Litig.,* 2000 WL 204112 (N.D.Ill. Feb.10, 2000); *In re Vitamins Antitrust Litig.,* 2001 WL 34312839, 2001 U.S. Dist. Lexis 25067 (D.D.C. July 16, 2001); *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403 (S.D.Tex. 1999); *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393 (S.D.N.Y.1999); *Kurzweil v.*

*Philip Morris Companies, Inc.*, 1999 WL 1076105 (S.D.N.Y. Nov.30, 1999); Theodore Eisenberg and Geoffrey Miller, *Attorneys' Fees in Class Action Settlements an Empirical Study*, 1 Journal of Empirical Legal Studies at 34 (2004)(reporting mean percentage award of 22% to 27.5% across all class action settlements)(copy attached at App.-J)[DE # 2638].

This Court is no exception. In fact, in the last several years, I, and my colleagues, have approved large class action settlements and awarded class counsel fees in the range of 33 and 1/3% of the amounts recovered:

| S.D. Fla. Class Action | Year | Cash Recovery | Fee Award (%) |
|---|---|---|---|
| In re Managed Care Litig. | 2003–04 | $310M | 35.5% 20 |
| In re Sunbeam Sec. Litig. | 2001 | $110M | 25% |
| Gutter | 2003 | $77.5M | 33⅓% |
| Terazosin Antitrust Litig. | 2005 | $ 75M | 33⅓% |
| Waters | 1999 | $ 40M | 33⅓% |

See *In re Managed Care Litig. v. Aetna*, 2003 WL 22850070, at *6 (S.D.Fla. Oct.24, 2003); *In re Managed Care Litig. (Cigna)*, 00–1334–MDL–MORENO (S.D.Fla. Feb. 2, 2004); *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323 (S.D.Fla.2001); *Gutter v. E.I. Dupont De Nemours & Co.*, 95–2152–CIV–GOLD (S.D.Fla. May 30, 2003); *In re Terazosin Hydrochloriide Antitrust Litig.*, 99–1317–MDL–SEITZ (S.D.Fla. Apr. 19, 2005); *Waters v. International Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999).[21]

While these decisions support the fee award requested here, I conclude, since this is not a typical class action which settled early for a few cents on the dollar, the more appropriate measure of a reasonable percentage is the market rate for a contingent fee in commercial cases. Silver Report at 13–37 (App.-C)[DE# 2638]. Indeed, in an effort to ensure that Class Counsel has the proper incentives to press forward for maximum recovery, other federal courts have already endorsed such an approach even in the class action settlement context itself, *See, e.g., In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir.2001); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *14 (E.D.Pa. June 4, 2004); *In re RJR Nabisco, Inc. Sec. Litig.*, 1992 WL 210138, at *7 (S.D.N.Y. Aug.24, 1992); *see also* Silver Report at 24 (App.-E)[DE # 2638]. In the words of Judge Easterbrook:

> We have held repeatedly that, when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.
>
> \* \* \* \* \* \*
>
> The district judge defined megafunds as settlements of $75 million and up [and held that fees in such] cases should be capped at 10% of the recovery, . . . although she recognized that fees of 30% and more are common and proper in smaller cases. This means that counsel for the consumer class could have re-

---

**20.** The *In re Managed Care Litigation* entry combines two settlements arising out of the same consolidated proceedings and the percentage award is inclusive of costs.

**21.** *See also Sands Point Partners, LP v. Pediatrix Med. Group, Inc.*, 2002 U.S. Dist. Lexis 25721 (S.D.Fla.2002) (30%); *In re CHS Elecs., Inc. Sec. Litig.*, 99–8186–CIV–GOLD (S.D.Fla.2002)(30%); *Golden v. U.S. Diagnostics, Inc.*, 97–8010–CIV–GOLD (S.D.Fla.1998)

(30%); *Ehrenreich v. Sensormatic Elecs. Corp.*, 95–6637–CIV–ZLOCH (S.D.Fla.1998) (30%); *Bakalor v. Integrated Communication Network, Inc.*, 96–2021–CIV–KING (S.D.Fla. 1997) (33.33%); *Silver v. Sensormatic*, 93–8619–CIV–MARCUS (S.D.Fla.1996) (33⅓%); *Tapken v. Brown*, 90–0691–CIV–MARCUS (S.D.Fla.1995) (33%); *In re Perfumania, Inc. Sec. Litig.*, 92–1490–CIV–MARCUS (S.D.Fla. 1993) (30%); *In re Royce Labs, Inc. Sec. Litig.*, 92–0923–CIV–MOORE (S.D.Fla.1993) (30%).

ceived $22 million in fees had they settled for $74 million but were limited to $8.2 million in fees because they obtained an extra $14 million for their clients.... Private parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for more than $74 million.

\* \* \* \* \* \*

On remand the district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)....

*In re Synthroid Marketing Litig.*, 264 F.3d at 718; *see also In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at \*14 ("What the market would pay is significant because, as the Seventh Circuit has explained, the goal of the fee setting process is to 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by Court Order.' ") (quoting *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir.1992)); *In re RJR Nabisco, Inc. Sec. Litig.*, 1992 WL 210138, at \*7 ("What should govern such awards is not the essentially whimsical view of a judge, or even a panel of judges, as to how much is enough in a particular case, but what the market pays in similar cases.").

The Seventh Circuit's "market approach" requires district courts to estimate the hypothetical terms of a contract that private plaintiffs would have entered into with counsel at the outset of the case, by referring to benchmarks such as actual agreements between members and attorneys and data from other suits. This is because "the best time to determine the rate is in the beginning of the case, not the end when hindsight alters the perception of the suits' riskiness, and sunk costs make it impossible for lawyers to walk away if the fee is too low." *Id.* at 718.

Applying this approach, I conclude that the fee requested is unquestionably within the range of, **if not below**, the market rate for private contingency fee agreements in commercial cases. As one recent study concluded: "Substantial empirical evidence indicates that a one-third fee is a common benchmark in private contingency fee cases." Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, at 12 (App–J)[DE # 2638]; Silver Report at 26, 31, 32–35 (App.-C)[DE # 2638]. That benchmark is then often adjusted upward to 40% or higher in the event of an appeal. Silver Report at 32 (App.-C)[DE # 2638]. Here, Class Counsel and the Class Representatives achieved a "market approach" on their own by agreeing that a 31 and 1/3 percent fee would be appropriate under the circumstances. I merely concur that the "market approach" referred to above independently confirms the basis of their agreement.

One additional related matter requires attention. In mega cases, such as this one, the attorneys' fee request, under a "market approach" can be for truly large amounts. In such cases, of course, the monetary recovery to the class typically is also in the hundreds of millions of dollars, even in the billions. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 339–40 (3d Cir.1998). Here, the final aggregate Class recovery has now been determined. What is remarkable is that all Class Members who have filed claims will recover their full compensatory damages and most of their prejudgment interest. In addition, the settlement envisions a procedure whereby additional persons may seek claims through the various States involved.

Objectors Lee, Choi and Freeland have argued that, as the total recovery increases, the percentage allocated to fees should decrease. While such an approach may

have validity when there is a large settlement short of a full trial, I conclude that the rationale has no reasonable application in this unique case for the reasons I have already discussed. *See In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323, 1337 (S.D.Fla.2001)(deciding that the large size of the settlement did not require the court to hesitate before departing upward from the 25% benchmark because the 30% fee award to counsel was "well within the range of fees award in comparable class-action cases.") Likewise, the court in *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 197 (E.D.Pa.2000) rejected this "declining percentage" method:

> Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give significant weight to the fact that "large attorneys' fee" serve to motivate capable counsel to undertake these actions.

While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit in *Camden*, the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. *See Camden*, 946 F.2d at 774 (percentage award should be determined early on in the litigation so that attorneys can devote their full time to attempting to increase the fund for the class, which in turn increases their own fee). By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little. As stated by Professor Coffee:

> Put simply, if courts were to hold that the percentage should decline sharply after, say, the $100 million threshold was passed, then plaintiff's counsel in a case such as this would have had little incentive to hold out for nine long years for the $1.2 billion recovery that it obtained. Holding out in this fashion exposed class counsel to real litigation and appellate risk and eroded the value of their recovery because of the time value of money. Moreover, if such a formula were mandated, defendants would quickly come to understand that plaintiffs' counsel lacked an incentive to maximize the recovery (at least beyond some threshold), and they could exploit this lack of incentive.

Coffee Declaration ¶¶ 24–26 (App.-A)[DE # 2638][22]

#### — Time and Labor Required-

The first *Johnson* factor is "time and labor." *Johnson*, 488 F.2d at 717. This factor requires the court to "weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities". *Id.* The key consideration simply is whether Class Counsel's claimed hours are reasonable given the circumstances of the case and the results achieved. For purposes of establishing a percentage, I do not find it necessary to review in detail the time records of the law firms involved as Class Counsel. *See Savoie v. Merchants Bank*, 166 F.3d 456, 461 n. 4 (2d. Cir.1999)(noting that one of the benefits of the percentage method is that it does not require a detailed review of time records). Other

---

22. By "exploit", Professor Coffee means to induce Class Counsel to enter into a cheap settlement, something that happens regularly given that the typical class action settles for less than 3 cents on the dollar. *See Recent Trends in Securities Class Action Litigation*, at 6 (NERA July 2005) (App.-J); Coffee Declaration ¶¶ 3 (App.A)[DE # 2638].

than as it relates to the controversy among Plaintiffs' attorneys, I consider it to be a meaningless exercise which, at best, is "mind numbing."

After reviewing the affidavits involved, and personally observing this case, I conclude that the time spent was significant. For instance, without discussing the merit of the time incurred, Pertnoy & Solowsky claims that 46,000 professional hours were integral to the success of this case. The firm claims its current lodestar-calculated at current market rates to adjust for delay of payments nearly $15.2 million dollars. [DE # 2635 at 20, 34]; *see also* PSA DEC. at ¶ 9 [DE # 2635, Exhibit "A"].

Since 1996, Stearns, Weaver claims that it has invested over $23 million in unpaid hours. *See* Affidavit of Eugene E. Stearns, Esq., (App.G)[DE # 2638]; [DE # 2126, 2127]. But Stearns, Weaver further claims that this merely represents a snapshot of its hours at this point in time. To prosecute over 11,000 claims against Exxon, Stearns, Weaver has, in addition to its regular team of lawyers and staff assigned to this case, employed and trained an additional team of lawyers and staff. At current and projected staffing levels for the Claims Administration Process, Stearns, Weaver will be incurring $500,000.00 on a monthly basis, or $6 million annually. *See* Affidavit of Eugene E. Stearns, Esq., ¶ 5 (App-G)[DE # 2638].

Prior to the settlement, Stearns, Weaver conservatively estimated that the presentation and adjudication of the 11,000 filed claims necessary to bring this matter to conclusion could take five more years. *Id.* Thus, prior to the settlement, additional attorneys' time in excess of $30 million was a reasonable estimate of what would have been required of the Stearns, Weaver, meaning that before the litigation is concluded, it would have invested over $50 million of time on an "at risk basis" that would otherwise be paid when the services

were rendered. *Id.* A reduction of this number is required due to the settlement, although Stearns, Weaver remains obligated under the terms of the Settlement Agreement to continue to represent the Class through the completion of the Claims Administration Process. The most current assessment of Stearns Weaver's time, from October 1996 through December 2005, is (1) 57,224 attorney hours, translating to a total attorneys' fee of $22,492,324 (at present rates), and (2) 32,-917 paralegal and clerk hours, for a total of $3,868,801.50. Thus, the total billable fees incurred by Stearns Weaver in connection with this matter through the end of December 2005 is $26,361,125.50. *See* Affidavit of Eugene E. Stearns, Esq., ¶ 4 (App.G)[DE # 2638].

I place the least emphasis on this factor, especially given the controversy among Class Counsel as to "who did what and when." A more detailed review of the actual time spent by each attorney involved would not affect my conclusion as to the appropriate percentage to apply. I accept, for purposes of this criteria, that the time involved by Class Counsel was extensive and not out of the range of the hours Exxon claimed it expended. Coffee Declaration ¶¶ 6, 27 (App.-A)[DE # 2638]; Silver Report at 32 (App.-C)[DE # 2638]; Theodore Eisenberg and Geoffrey Miller, *Attorneys Fees in Class Action Settlements an Empirical Study,* 1 Journal of Empirical Legal Studies at 12 n. 15 (2004)(App.-J)[DE # 2638].

### -Fixed or Contingent Fee-

The sixth *Johnson* factor concerns the type of fee arrangement (hourly or contingent) entered into by the attorney. *Johnson,* 488 F.2d at 718. "A contingency fee arrangement often justifies an increase in the award of attorneys' fees." *Behrens v. Wometco Enters.,* 118 F.R.D. 534, 548 (S.D.Fla.1988); *see also Hall v. Bd. of Sch.*

*Comm'rs,* 707 F.2d 464, 465 (11th Cir.1983)(concluding that district court abused its discretion where it failed to award an enhancement of the amount of attorneys' fees where plaintiffs' counsel was retained under a contingency fee agreement). As recognized in *Behrens,* without a contingent fee, "very few lawyers could take on the representation of a class client given the investment of substantial time, effort and money, especially in light of the risks of recovering nothing." 118 F.R.D. at 548 (citations omitted).

This factor weighs heavily in favor of a 31 and 1/3% percentage fee for Class Counsel because the fee in this action has been completely contingent. Despite their extraordinary work, Class Counsel has not recovered any attorneys' fees since this case was filed in 1992. This lengthy time period justifies such special consideration given the investment of substantial time, effort and money, especially in light of the risks of recovering nothing. While the fact that there was a private contingent fee agreement establishing a fee arrangement at 31 and 1/3% is not determinative, it is nonetheless important. Accordingly, the fee arrangement remains one factor to be considered and weighed under the *Johnson* analysis.

### -Time Limitations Imposed by the Client or the Circumstances-

The seventh *Johnson* factor concerns "[t]ime limitations imposed by the client or circumstances." *Johnson,* 488 F.2d at 718. This factor recognizes that "priority work that delays the lawyer's other legal work is entitled to some premium." *Id.* In considering this factor, many courts have found that "time pressures" warrant an increased fee award. *See Reynolds v. Alabama Dept. of Transp.,* 926 F.Supp. 1448, 1458 (M.D.Ala.1995)(finding evidence of this factor because of the demanding trial schedule and the large number of claims that had to be evaluated and presented in

a short time); *Louis v. Nelson,* 646 F.Supp. 1300, 1313 (S.D.Fla.1986)("The time pressures of this case were constant. They were imposed, in large part, by the Court, and by the appellate courts, but were also due in part to the exigencies of the situation. The demands of the Court were overwhelming. In sum, the pace was rather hectic throughout this case.").

In February 1999, this case was transferred to this Division upon the death of Judge James Kehoe. Prior to the transfer, a regime of hard work was required by my predecessor. After the transfer, the pace became even harder in order to reach the trial date agreed upon by the Court and counsel. Substantial work was required to narrow the issues. As one firm put it, "[I]n the months that followed, the lawyers in this Firm had no other cases and no other life." Stearns Weaver's Petition for An Award of Attorneys' Fees, Costs and Reimbursable Expenses [DE # 2125 at 46]. From my own personal experience, I believe this to be a true statement. The time commitments were adhered to by all concerned and the first trial timely commenced, and, because of a lack of a unanimous verdict, thereafter "recommenced." The frantic pace continued throughout the appellate proceedings and the Claims Administration Process due to the complexity of the issues involved and the exigencies surrounding the number of claims filed. If anything, the pace increased once the Claims Administration Process began in earnest. By the time of the Settlement Agreement, twenty-two motions for summary judgment had been filed by Class Counsel with respect to 1,300 claims. Accordingly, I give significant weight to this factor in setting the percentage.

### -Nature and Length of Professional Relationship; Undesirability-

The tenth *Johnson* factor is the "[t]he 'undesirability' of the case." *Johnson,* 488

F.2d at 719. This factor acknowledges that attorneys should be rewarded for taking on cases that other firms have rejected due to thorny factual circumstances, the possible outcome of the case, or any other number of reasons. *Sunbeam*, 176 F.Supp.2d at 1336. Here, a number of well-known attorneys abstained from taking on Exxon. *See* PSA DEC. ¶ 98 [DE # 2635, Exhibit "A"].

The eleventh *Johnson* factor is "[t]he nature and length of the professional relationship with the client." *Johnson*, 488 F.2d at 719. As observed in *Ressler*, 149 F.R.D. at 655, a higher fee may be warranted in class actions where counsel for the class had no prior relationship with the named plaintiffs. Here, the named plaintiffs had no "track record" with either the Pertnoy & Solowsky or Stearns, Weaver firms.

I place significant weight on the tenth factor and minimal weight on the eleventh factor. Regarding "undesirability," I recognize the risks to Class Counsel in accepting representation at the early stages of the proceedings when other notable lawyers had declined. Accordingly, under the tenth *Johnson* factor, I conclude that such risk should be significantly recognized in establishing the percentage.

Regarding the eleventh *Johnson* factor, the significance of the risk of representation was not diminished by a long and beneficial previous relationship with the client. I concur with the Court's evaluation in *Ressler* that "... to the extent this factor may have independent significance in the context of a class action, it militates in favor of the 30% fee award [31 and 1/3% in this case] sought here because plaintiff did not have a 'track record' with the law firm that agreed to prosecute the action on his behalf." *Id.* 149 F.R.D. at 655.

### c. Additional Factors

I also consider "additional factors" unique to [this] "particular case which [are] relevant." *Camden I*, 946 F.2d at 775. Here, I conclude that two such additional factors are particularly relevant: (1) the additional work that remains to complete the Claims Administration Process, and (2) the role that Class Counsel played as "private attorneys general" to vindicate the rights of the dealer plaintiffs.

### -The Continuing Claims Administration Process-

Under the settlement, the Claims Administration Process is far from complete. The unique aspect of the settlement is that Class Counsel continues to represent the Class through the process; that is, throughout the duration of the Claims Administration Process, Class Counsel will remain responsible for designating and presenting all claims for adjudication before the Special Master on a rolling basis, marshaling the supporting documentation that may be available for each claim, and identifying those gallons as to which there are competing claims requiring adjudication. This aspect of the class representation requires recognition as a factor unique to this case which supports the application of a higher percentage award. As of the date of the Fairness Hearing, the Special Master had already adjudicated 20 motions for summary judgment, thereby posturing more than $276 million in Class Member claims for immediate distribution.

### — Economics of Prosecuting a Class Action, Public Policy, and the Private Attorneys General-

The Supreme Court has observed that without the possibility of recovering an attorneys' fee, most class actions would never be filed. *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)(observing that "[w]here it is not economically feasible to obtain relief within the traditional frame-

work of a multiplicity of small individual suits for damages, aggrieved person may be without any effective redress unless they may employ the class action device"). Attorneys who undertake the risk to vindicate legal rights that may otherwise go unredressed function as "private attorneys general." *Id.* at 338, 100 S.Ct. 1166. The courts treat successfully fulfilling such a role as a *Johnson* factor when awarding class counsel attorneys' fees. *E.g. Ressler,* 149 F.R.D. at 657 (noting that when class counsel act as private attorneys general, "public policy favors the granting of counsel fees sufficient to reward counsel for bringing these actions and to encourage them to bring additional such actions.").

In the context of this case, the oil companies' typical success in dealer litigation has stemmed in large part from their ability to overwhelm the small firm plaintiff lawyers that typically represent the dealers' interests. In this case, the Class was able to battle Exxon because Class Counsel was of sufficient size, capitalization and skill to withstand the defense's onslaught. As noted above, Class Counsel has risked millions of dollars in un-reimbursed attorneys' time and additional millions in out-of-pocket costs. Unless that risk is compensated with a commensurate reward, few firms, no matter how large or well financed, will have any incentive to represent the small stake holders in class actions against corporate America, no matter how worthy the cause or wrongful the defendant's conduct.[23]

Absent an award of fees that adequately compensates Class Counsel, the entire purpose and function of class litigation under Rule 23 of the Federal Rules of Civil Procedure will be undermined and subverted to the interests of those lawyers who would prefer to take minor sums to serve their own self interest rather than obtaining real justice on behalf of their injured clients. *See* John J. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter is Not Working,* Maryland Law Review, 216, 225–26 (1983) (the private attorney general provides an important mechanism "to enforce the federal antitrust and securities laws, to challenge corporate self-dealing in derivative actions, and to protect a host of other statutory policies," but in the absence of appropriate incentive structures, "litigated judgments are few, cheap settlements are common, and ... the private watchdog can be bought off by tossing him the juicy bone of a higher-than-ordinary fee award in return for his acceptance of an inadequate settlement").

The "private attorney general" aspect is unique to the facts of this case. Class

---

**23.** I agree with the well-written thoughts of District Judge Miles W. Lord: "The contingent fee and the class action are the 'poor man's keys to the courthouse.' Both vehicles allow the average citizen and taxpayer to have their injuries redressed and their rights protected. Both permit persons of limited resources to obtain competent legal counsel, an essential ingredient in our adversary system of justice. . . . The annals of class action case law are replete with examples of lawyers who were willing to commit their personal resources over a substantial period of time to present a class of injured plaintiffs, motivated only by the incentive that if they succeed in vindicating the rights of their class clients, they would be paid an attorney's fee at least commensurate with what they would have received for winning an equivalent sum representing a single client. Often, these suits are brought against companies with resources that allow them to retain squadrons of topflight lawyers, and all of the technological paraphernalia and human resources that have become characteristic of modern litigation. . . . If the plaintiff's bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear." *Muehler v. Land O'Lakes, Inc.,* 617 F.Supp. 1370, 1375–76 (D.Minn.1985).

Counsel concluded that with respect to each claim not timely filed by a Class Member, the unclaimed property statutes of each of the respective states in which Exxon dealers were located authorized the state attorneys general to step in the shoes of the missing claims, file a claim on its behalf, and hold any monies recovered for the missing claimant in perpetuity. As a result of Class Counsel's efforts, 20 state attorneys general, representing 75% of the missing claimants by dollar amount, filed claims during the last week of the Claims Administration Process. This effort substantially enhanced the opportunity for settlement. The possibility that the states would be entitled to the proceeds of any claim that Exxon might defeat was one of the critical factors leading to the settlement of this case. I give significant weight to this factor in deciding in favor of a full 31 and 1/3% award to Class Counsel.

Therefore, having determined the appropriate percentage of fees to be awarded at 31 and 1/3 percent, I now turn to issue of incentive awards.

## IV. INCENTIVE AWARDS

The Class Representatives consist of nine named Plaintiffs who are: Rylyns Enterprises, Inc., through Richard P. Durishin as president; Paul Bove; Martin Cook; George Dalton; R. William McGillicuddy ("McGillicuddy"); David Wise; Allapattah Services, Inc., through Alberto Gonzalez; Robert Lewis, Inc., through Robert Lewis, and John Pinder. Collectively, the Class Representatives are seeking 1.5% of the common benefit received by the Class as an incentive award. The basis for the 1.5% request comes from the fact that Class Counsel have reduced their fee from 33 and 1/3% to 31 and 1/3%, and the Class Representatives have sought to maintain their request within the scope of that reduction. Given the settlement amount of $1,075,000,000.00, less the $15,000,000.00 reduction for attorneys' fees in the three fee-shifting states, the total incentive award at 1.5% equals $15,900,000.00 or approximately (when divided by 9) $1,766,666.00 per named plaintiff. Here, the issues include (1) whether an incentive award is proper, and (2) how much of an incentive award is reasonable. In sum, I conclude that an incentive award is appropriate in this case, and that an appropriate percentage amount is one and one-half percent (1.5%). As discussed below, I reduce the amount to be paid to Class Representative McGillicuddy because of partial forfeiture.

### a. Legal Analysis Regarding Appropriateness of Incentive Award

Incentive awards are not uncommon in class action litigation where, as here, a common fund has been created for the benefit of the class. Incentive awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation. *In re Southern Ohio Corr. Facility*, 175 F.R.D. 270, 272–76 (S.D.Ohio 1997). Incentive awards serve an important function, particularly where the named plaintiffs participated actively in the litigation. *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 2005 WL 388562, at *31 (S.D.N.Y. Feb.18, 2005).

While the Eleventh Circuit has not expressly set forth guidelines for courts to use in determining incentive awards, there is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action. In fact, " '[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.' " *Ingram v. Coca–Cola Co.*, 200 F.R.D. 685, 694 (N.D.Ga.2001)(quoting *In re Southern Ohio Corr. Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997)(collecting cases)); *see also*

*Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir.1998) (affirming award of $25,000 to named plaintiff); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C.2002) ("Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class.... In fact, [c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation") (internal quotations and citation omitted); *Godshall v. Franklin Mint Co.*, 2004 WL 2745890, at *6 (E.D.Pa. Dec.1, 2004) (granting special award of $20,000 to each named plaintiff for their work as class representatives); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18–19 (E.D.Pa. June 2, 2004) (awarding $25,000 for each of the five class representatives); *Tenuto v. Transworld Sys.*, 2002 WL 188569, at *4–5 (E.D.Pa. Jan.31, 2002) (granting award of $2,000); *Dornberger v. Metropolitan Life Ins. Co.*, 203 F.R.D. 118, 124–125 (S.D.N.Y.2001) (approving an award of $10,000 for Dornberger and $1,500 for the eight sub-class representatives); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D.Pa.2000) ("courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 449 (S.D.Tex.1999) (granting awards of between $1,000 and $10,000); *In re Residential Doors Antitrust Litig.*, 1998 WL 151804, at *11 (E.D.Pa. Apr.2, 1998) (awarding an incentive award of $10,000 to each of the four Class represen-

tatives); *In re Plastic Tableware Antitrust Litig.*, 1995 WL 723175, at *2 (E.D.Pa. Dec.4, 1995) (granting award of $3,000); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D.Ga.1993) (granting award of $2,000 to plaintiffs that produced documents and awarding $5,000 to plaintiffs that were also deposed).

In *Ingram*, the district court approved a settlement of an employment discrimination class action that included payments of $300,000 to each of four class representatives (for a total of $1.2 million) as well as lesser compensation to class members who submitted affidavits. *Id.* The awards to the four principal class representatives totaled more than 1% of the "total current cash settlement fund," of $ 103.5 million, although smaller awards were made to other class representatives. 200 F.R.D. at 692 n. 11 (describing percentage share awarded as attorneys' fee).[24]

Without doubt, there is a need for special scrutiny for such awards, particularly in settlements, because of the danger of collusion. *See Holmes v. Continental Can. Co.*, 706 F.2d 1144, 1147 (11th Cir.1983)("Settlements entailing disproportionately greater benefits to named parties are proper only when the totality of circumstances combine to dispel the 'cloud of collusion which such a settlement suggests'")(quoting *Women's Comm. for Equal Employment Opportunity v. NBC*, 76 F.R.D. 173, 182 (S.D.N.Y.1977); *United States v. City of Miami*, 614 F.2d 1322, 1330–31 (5th Cir.1980); *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir.2003)). However, the need for structural safeguards against collusion does not apply to cases like this one that have been litigated

---

**24.** *See also RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, 2003 WL 21136726 (S.D.N.Y. May 15, 2003)(court awarded class representatives which faced liability for costs $25,000, which constituted 2.5% of the $975,000 settlement); *Enter. Energy Corp. v.* *Columbia Gas Transmission Corp.*, 137 F.R.D. 240 (S.D.Ohio 1991)(awarding a total of $300,000 to class representatives, or .93% of the current cash portions of the settlement and about .53% of its estimated present value).

to judgment. There is no uncertainty about whether the Class Representatives in this case sought the maximum recovery for the class. They did, and they have succeeded in the settlement.

### b. Appropriateness of an Incentive Award

■ An Incentive Award is appropriate in this case. This conclusion, however, understates the significance of the result. While I have reviewed numerous precedents that have approved incentive awards, I have found no case that has required as much from the Class Representatives. Each of the gentlemen involved, and their families, have shown unusual courage and commitment. As noted in the Petition from the Florida Representatives, "[T]he facts of their service sets the standard that may one day be equaled but which can never be bested." Petition of Class Representatives Allapattah Services, Robert Lewis, Inc., and John Pinder [DE # 2116 at 2]. I join in this statement with much admiration.

The Class Representatives in general played a substantial role in this litigation. This is not a case where lawyers inappropriately recruit plaintiffs to serve as "figureheads" for suits the lawyers themselves want to file and settle. In contrast, the Class Representatives brought Exxon's breach to the attention of the lawyers. They were involved in selecting and replacing trial counsel, communicating with the Class, gathering information from the Class, and participating in decision-making about how to conduct the case.

Besides the Class Representatives' unusual commitment of time and effort to the litigation, the other extraordinary feature of their role in this case is the risk they each took to see the case through to a successful conclusion. In a typical class action, the named plaintiffs—although nominally liable for costs—face no real downside risk. This case, however, was different. When the theory of liability was untested, the Class Representatives agreed to accept liability for litigation costs, made personal contributions to defray those costs, and promised to help collect money from other dealers to cover the costs. Although Class Counsel made their own heavy investments of skill, time and money in the case, the financial commitment by the Class Representatives sets this case apart from the typical class action.

In addition to accepting responsibility for their own side's costs, the Class Representatives faced liability for Exxon's substantial taxable costs. The first retainer agreements recognized that potential liability. Soon after, the potential for greater individual liability became evident in the event Exxon prevailed. First and foremost was Exxon's aggressiveness in defending the litigation. The message that Exxon would retaliate against the Class Representatives and try to bankrupt them was unambiguously delivered at a mediation attended by them (and some of their spouses) in Houston, Texas in 1998.[25] Second, Exxon's offer of judgment in August 1998[26] was intended to heighten the risk of

25. According to Stearns Decl. ¶ 204, the Class Representatives (and some of their spouses) attended the mediation session at Exxon's invitation in Houston, Texas. Instead of making a serious settlement proposal, Exxon's counsel literally brought the risk of losing home to the Class Representatives and their families: "Directing his words directly to the named Plaintiffs and their spouses, telling

them that when Exxon won the case, it was going to obtain cost judgments against them personally and financially ruin each and every one of them (each of these words had large pauses in between)." *Id.*

26. On August 28, 1998, Exxon made a $15 million Offer of Judgment pursuant to Fed. R.Civ.P. 68. Deducting attorneys' fees and

personal liability for the Class Representatives even if the Class won. Although Exxon's taxable costs would be smaller than the offer, those costs would be divided only among the Class Representatives. Thus, even a modest victory for the Class could have been financially ruinous for the Class Representatives. Third, due to the magnitude of the case and the fact that it was tried twice, the taxable costs were substantially greater than in the ordinary case. Finally, the mistrial made the risk that Exxon could win and collect its costs more than a theoretical concern. In sum, the potency of Exxon's threat and the seriousness with which the Class Representatives regarded it was evident when two of the original eleven Class Representatives, Roy Page and Jim Edmonds, withdrew as class representatives, before the second trial.[27] A larger exodus may have prompted Exxon to request a re-examination of class certification.

The willingness of the Class Representatives to face substantial risks of personal harm is particularly striking when those risks are compared to their individual potential gains. The average damage award (not including prejudgment interest) of the nine individuals owning the dealerships named as plaintiffs was slightly less than $175,000. Of those damage amounts, the

Class Representatives agreed to pay one-third of compensatory damages as a contingency fee. Under these circumstances, the potential individual liability for costs was potentially more than the actual net recovery for most or all of the Class Representatives. In my view, such significant personal risk, coupled with the expenditure of time and effort to guide the litigation to a successful conclusion, should be compensated, lest the Class itself be unjustly enriched. Otherwise stated, it would be inequitable for them to alone bear the costs and risks they incurred for the benefit of the Class as it would to impose the full costs of paying lawyers to litigate this action on the Class Representatives.

Additional reasons support the case for compensating the Class Representatives here. Because this case was tried (twice), and not initially settled, the Class Representatives proved their fidelity to the Class over more than a decade of fiercely-defended litigation. The interests of the Class, such as here, are better served when they are presented by vigilant, competent and independent class representatives who actively monitor class counsel and the conduct of the litigation. Moreover, where lawyers are rewarded for their

---

costs, that offer would have left the 10,000 Class Members an average recovery of about $1000.00, or the equivalent of the widely-criticized "coupon" settlements that extinguish the claims of class members for a small faction of their value. The offer meant that, even if the plaintiffs prevailed on liability, but the jury did not award enough in damages, Exxon could still seek costs. It was estimated, at the time, that the Class Representatives could have been liable for between $100,000.00 to $500,000.00

**27.** On January 11, 2001, only a few days before the second trial began, Class Counsel sent a letter to the Class Representatives presenting the potential risks and benefits of going forward in stark terms. McGillicuddy

Decl. ¶ 43, Ex. O. In the letter, Class Counsel advised that Exxon had offered not to seek its taxable costs against any of the named plaintiffs who agreed to withdraw, and that Roy Page and Jim Edmonds had accepted the offer. As for the remaining Class Representatives, Class Counsel acknowledged that the "risk exists" that Exxon would seek taxable costs against them, but promised to oppose those efforts and "to vigorously pursue the payment of premiums." Based on news articles at the time, the perception was that the first jury significantly favored Exxon's case, and that Exxon lost by one vote. Accordingly, the Class Representatives faced a difficult choice, but decided to continue in the interests of the Class.

risk and efforts on behalf of a class, but class representatives are not, there is little incentive for class representatives to serve as active client participants in the litigation, thus negating the "adequate representation" safeguard of Rule 23 and transferring all decision-making responsibility to counsel.

■ With this background, I turn to the task of determining what percentage of the recovery obtained by the Class should be attributed to the Class Representatives. Absent specific criteria from the Eleventh Circuit,[28] in setting the percentage, I rely on the specific factors evidenced here. These factors include the time, money and effort incurred, the duration of the litigation, the relatively small personal benefit enjoyed by the Class Representatives as a result of the litigation, the risk of their own litigation costs, the risk of liability for Exxon's costs, the risk of retaliation from Exxon, the out-of-pocket expenses incurred, and the unusual fidelity to the Class Representatives under extraordinarily difficult circumstances. In fact, a case could be made for a higher percentage than one-and-one-half percent. Nonetheless, the Class Representatives have sought to keep their request within the scope of the reduced attorneys' fee for

Class Counsel so that the Class Members would not be subject to payment of a sum over the 33 and 1/3% initially requested by Class Counsel.

## V. ALLOCATION OF THE ATTORNEYS' FEES

### a. Effect of Letter Agreement on Allocation and Award of Attorneys' Fees

Pertnoy & Solowsky, Bowen and Grutman have moved the Court to enforce the October 14, 1996, fee allocation agreement among Class Counsel ("the 1996 Letter Agreement"). [*See* DE # 1845, 1846 & 1848]. Specifically, the 1996 Agreement provided:

> [W]e have evaluated the respective contributions each of us has already made and will be required to make and apportioned our respective participation in any proceeds which may be recovered after reimbursement of hard costs as outlined below, to correspond with our overall historical and future professional contributions as follows:
>
> | | |
> |---|---|
> | Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A. | 25% |
> | Jewel Grutman, Esq. | 3% |
> | Law Offices of Gerald M. Bowen | 25% |
> | Engels, Pertnoy, Solowsky & Allen | 47% |

The aforementioned participating percentages are agreed upon as generally

---

28. "The criteria courts may consider in determining whether to make an incentive award include: 1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation and; 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *See Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (S.D.Cal.1995); *Enter. Energy Corp.*, 137 F.R.D. at 250 (considering a number of factors including (1) the action taken by the class representative to protect the interest of the class, (2) whether those actions resulted in a benefit to the class, (3) whether the class

representatives assumed direct financial risk, and (4) the amount of time and effort spent by the class representatives in pursuing the action); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 355 (S.D.N.Y.2005) ("In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including the personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery."); Richard Greenfield, "Rewarding the Class Representative: An Idea Whose Time Has Come," 9 Class Action Reports 4 (1986).

corresponding to the division of responsibility and contributions made from the inception of each of the respective law firms.

Exhibit 6 to Motion to Enforce [DE# 1845].

The 1996 Letter Agreement further provided that "[a]lthough each firm may be required to file separate attorney's fees applications with the court, it is agreed that all such fees shall be divided as provided herein.' "[29] It further specified the work to be performed by Stearns, Weaver and Bowen. In exchange for its 25% share, Stearns, Weaver agreed:

Eugene E. Stearns of the firm of [Stearns, Weaver] shall serve a principal trial counsel in this cause. Mr. Stearns agrees to provide such other partners, associates, paralegals and staff at Stearns Weaver as he deems reasonably necessary to perform the responsibilities of principal trial counsel and to handle the organization of the case; Mr. Stearns ... agrees that he and his firm will use the discovery process between now and trial as a means of becoming completely versed in all aspects of the pending litigation. In addition to their role as principal trial counsel, Eugene E. Stearns and the firm of Stearns, Weaver will conduct and defend principal depositions of the parties, witnesses and experts as agreed upon among plaintiffs' counsel of record; will handle and defend motions for summary judgment, motions for decertification of the plaintiff class; will provide litigation support; will organize documents and all trial exhibits in such a way that is comfortable

and acceptable to their manner of working; Stearns Weaver agrees to have at least one lawyer from its firm present at all depositions, hearings and conferences in the case; Mr. Stearns will personally handle the overall management and prosecution of this case in consultation with principal members of [Pertnoy, Solowsky] and Gerald Bowen.

Pertnoy & Solowsky's initial position in its motion to enforce was that their 47% share was intended to compensate them for (a) past legal and financial contributions to the case, and (b) their continued contributions to the litigation fund, and (c) their agreement that:

[Pertnoy & Solowsky] will act as coordinating and litigation counsel in the management of the case, in collaboration with the law offices of Stearns Weaver and the Law Offices of Gerald M. Bowen.

Bowen's position is that his 25% share reflected his past performance, his agreement to contribute to the litigation fund, and his agreement that:

It is further understood that Gerald M. Bowen has acted and will continue to act as petroleum marketing counsel. In that regard, Gerald Bowen has been one of the principal architects of the substantive legal arguments to date, and has alternated as acting lead counsel with [Pertnoy & Solowsky] following Roy Grutman's passing. Mr. Bowen will attend key depositions and will prepare all plaintiff class members for deposition and trial. The clients originally contacted Gerald M. Bowen, who although a sole practitioner, not only originated the matter, but is a repository of substantive

---

**29.** The 1996 Letter Agreement also anticipated a future claim by McKenna & Cuneo for fees and costs in the event of a settlement or verdict for plaintiffs. It provided that Class Counsel will attempt to negotiate with McKenna & Cuneo but, if no agreement is reached and the Court awards McKenna & Cuneo a fee and reimbursement of costs on the basis of *quantum meruit,* "said monies shall first be paid to McKenna & Cuneo before any monies distributed pursuant to the terms of this agreement."

expertise applicable to the substantive issues involved in the case, as to which he has provided and will continue to provide the primary guidance and direction.
*Id.*

Stearns, Weaver rejects Pertnoy & Solowsky/Bowen/Grutmans' principal contention that the allocation of fees among class counsel is a private contractual matter beyond the purview of the Court's authority. Instead, Stearns, Weaver argues that it is the district court which retains the ultimate fee allocation among Class Counsel, and that any disproportionate allocation of attorneys' fees in class actions are unenforceable. Evidently, Pertnoy & Solowsky now concedes this position by acknowledging, at the evidentiary hearing on allocation of fees, that attorneys' fees must be proportionate to the work performed. [*See* Transcript of May 5, 2006 at pages 90,

91, 94, 95, 96].[30] Mr. Pertnoy's position remains, however, that Pertnoy & Solowsky's contributions were proportional to what was included in the Letter Agreement so that it could be enforced. [*See* Transcript of proceedings of May 5, 2006 at page 99].[31]

I begin by analyzing the Federal Court's authority to control fee allocations among Class Counsel. As noted in *FPI/Agretech Sec. Litig.*, 105 F.3d 469, 473 (9th Cir. 1997), "there is very little case law concerning the allocation of attorneys' fees among co-counsel." Notwithstanding, I adhere to the majority view (as discussed below) which recognizes the district court's broad discretion when the issue arises in class actions following settlement which establishes a common fund. In such cases, the court must provide a "concise but clear explanation" of its reasons. *Id.* I shall now attempt to do so.

---

**30.** Mr. Pertnoy stated: "In our firm's motion to enforce, when followed by the hearing that Judge Gold conducted where all parties conceded that he has the wide latitude and discretion to determine whether there's good cause to deviate from those numbers [i.e. the percentages in the letter agreement], I believe our position has been that it has been proportional and I believe that Judge Gold has the discretion, and I think there are circumstances that have arisen since the case has progressed a lot longer than anyone thought it would, that would warrant Judge Gold making some adjustments."

**31.** Mr. Pertnoy further stated: "That, yes, we should allow the Court to exercise some of its discretion and there should be some alterations, but the proportional alterations, I believe, should not be as significant as you're proposing." *Id.* at 100. Mr. Pertnoy further states: "I believe that the Court should look at the contract as the starting point.... I believe that adjustments should be made to the letter agreement and that the judge should consider all of the factors when determining who contributed what to this outcome and that he has the discretion to modify the terms of that letter agreement and make adjustments in it, based upon what Judge Gold

finds to be the relative and proportionate contributions of counsel." *Id.* at 101 (emphasis added).

Mr. Stearns asked: "Is it your view that when Judge Gold modifies the contract, as you've characterized it, that your firm should receive a fee, at the end of the day when its's modified, proportionate to your contribution to the Class?"

Mr. Pertnoy responded: "I believe that is a correct statement." *Id.* at 101. (emphasis added).

I conclude that Mr. Pertnoy's position at the evidentiary hearing is consistent with the research done by his own associate only a few weeks after the 1996 Letter Agreement was signed. *See* Stearns, Weaver Trial Exhibit Number 350. This research discussed many of the same decisions referenced in this Order. It is also consistent with representations made by Mr. Pertnoy and Mr. Solowsky to Mr. Stearns during the course of the Exxon litigation. Given these circumstances, it is inexplicable that Pertnoy & Solowsky would request this Court to enforce the 1996 Letter Agreement, without the benefit of an evidentiary hearing, in order to award them 47% of the fee award [*See* DE # 1845].

It is fundamental that the submission of a fee application in a federal court always implicates the court's equitable review function. This is especially true where counsel is seeking a percentage award of the common fund. *See, e.g., Camden I,* 946 F.2d at 771 (explaining that historically the rationale entitling counsel to a percentage of the common fund derives from the equitable power of the court) (citing *Trustees v. Greenough,* 105 U.S. 527, 15 Otto 527, 26 L.Ed. 1157 (1881) and *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885)). As further explained in the Fifth Circuit's pre-*Bonner*[32] *Hoffert* decision, "... where, as here ..., the plaintiff's attorney himself invokes the court's equitable power to approve a settlement agreement to distribute the proceeds, the court must scrutinize the reasonableness of the contingent attorney's fee contract which affects the net recovery to the plaintiff." *Hoffert v. General Motors,* 656 F.2d 161, 164 (5th Cir. 1981). This principle is even more obvious in the class context under Fed.R.Civ.P. 23(g)(specifying considerations for the court's appointment and determination of the adequacy of class counsel including counsel's experience, knowledge, resources, and proposed terms for attorneys' fees).[33]

■ Admittedly, Rule 23 did not require at the time,[34] nor did Class Counsel obtain, court approval of their fee arrangements during 1997. Furthermore, Judge Kehoe's Order on class certification did not address the issue of "lead counsel" or the allocation of counsel's responsibilities. But, by not pursuing this alternative at the time, the law firms involved are now confronted with the legal reality that a federal court always has authority to reject agreements allocating fees among class counsel whenever there is cause to do so. *See In re Synthroid Marketing Litig.,* 325 F.3d 974, 977 (7th Cir.2003)(concluding that an agreement as to fees reached by counsel in a class action is not binding, rather it must be approved by the court); *Longden v. Sunderman,* 979 F.2d 1095, 1103 (5th Cir.1992)(citing *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 216, 222–26 (2nd Cir.1987)); *In re Agent Orange Prod. Liab.* Litig., 818 F.2d 216, 222–26 (2nd Cir.1987)(discussing the district court's role as protector of the class interests under Fed.R.Civ.P. 23(e) and its role to assure reasonableness in the awarding of fees in equitable fund cases); *Smiley v. Sincoff,* 958 F.2d 498, 501–02 (2nd Cir.1992)(concluding that court may reject an attorneys' fee agreement if it "finds good reason to do so"); *Prandini v. National Tea Co.,* 557 F.2d 1015, 1019 (3rd Cir.1977)(noting that district court judge correctly rejected fee agreement which divided fees without regard to work performed), *disapproved on other grounds by Evans v. Jeff D.,* 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986).

In *In re Agent Orange Prod. Liab., Litig.,* 818 F.2d 216, 223 (2nd Cir.1987), the Second Circuit ruled that the distribution of fees in a fee allocation agreement must be in proportion to the services rendered,

32. In *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

33. As noted in *In re Synthroid Marketing Litig.,* 325 F.3d 974, 977 (7th Cir.2003), with respect to agreements among counsel to divide fees, "At all events, until a contract is signed—and in class litigation, approved by the court under Fed.R.Civ.P. 23(e)—no one is bound by any of its proposed terms."

34. The subsequent adoption of Fed.R.Civ.P. 23(g), which requires formal court approval of class counsel after consideration of skills, resources and fee arrangements, should in the future prevent a reoccurrence of the issue addressed by this Order.

and distinguished those cases in which the court permitted class counsel to amicably divide a fee among themselves, holding, in a manner appropriate to this case:

> We reject this authority, however, to the extent it allows counsel to divide the award among themselves in any manner they deem satisfactory under a private fee sharing agreement. Such a division overlooks the district court's role as protector of the class interests under Fed. R.Civ.P. 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases ... In addition, this approach overlooks the class attorney's "duty" ... to be sure that the court, in passing on [the] fee application, "has all the facts" as well as their "fiduciary duty to the class ... not to overreach."

*Id.* at 223 (citations omitted).

The Second Circuit also rejected the argument that a successful outcome in the litigation could cure an improperly disproportionate allocation of fees: "the test to be applied is whether, at the time a fee sharing agreement is reached, class counsel are placed in a position that might endanger the *fair representation of their clients* and whether they will be compensated on some basis other than for legal services performed." *Id.* at 224.

The Second Circuit's analysis in *In re Agent Orange Prod. Liab. Litig.* raises the further question as to when, and under what criteria, is there "good cause" not to approve a fee allocation agreement. In an earlier decision, the Second Circuit, while stating that presence of an arms' length negotiated agreement among the parties weighs strongly in favor of approval, also recognized that ... "a district judge's discretion [to set aside an agreement] is not limited to situations in which it finds wind-

fall, adverse class impact, or other irregularities in a fee agreement. Despite the absence of such factors, if the court finds *good reason* to do so, it may reject an agreement as to attorney's fees just as it may reject an agreement as to the substantive claims." *Mary Jones v. Amalgamated Warbasse Houses, Inc.*, 721 F.2d 881, 884 (2nd Cir.1983)(emphasis added).

The Ninth Circuit, after reviewing the case law, followed the Second Circuit's analysis, by also rejecting the proposition that a district court may decline to approve a fee allocation only if it is contrary to the interests of the class or in violation of the rules of professional conduct. Thus, in *In re FPI/Agretech Securities Litig.*, 105 F.3d 469 (9th Cir.1997), the Ninth Circuit rejected a private and undisclosed agreement to divide attorneys' fees in a class action: "the district court had broad authority over awards of attorneys' fees" and "may refuse to accept a fee allocation agreement whenever there is good cause to do so." *Id.* at 472–473. Accordingly, the Ninth Circuit declined to "curb the district court's broad discretion in exercising their equitable power to award attorneys' fees in common fund class actions by requiring that the fee allocation proposals be treated as enforceable contracts." The Court concluded that "the relative efforts of, and benefits conferred upon by the class by co-counsel are proper bases for refusing to approve a fee allocation proposal." *Id.* at 474. It stated: " ... this case supports the proposition that district courts have the authority to reject a fee allocation that does not accurately reflect the amount of work performed by the various attorneys." *Id.*, 105 F.3d at 473.

■ I do not consider that following the well-reasoned majority approach constitutes "judicial meddling." [35] This is espe-

---

**35.** The cases argued by Pertnoy & Solowsky do not involve attorneys' fees in a class ac-

tion, resulting from a common fund, where such fees are derived from principles of equi-

cially true since the "good cause" for my intervention in this case is not based on some whimsical ground. Rather, its is firmly rooted on the conclusion that enforcing the 1996 Letter Agreement would result in a grossly disproportionate award among the five law firms in relation to services actually rendered, and benefits bestowed on the class, and would, even at this late date, prejudice the Class' interests.[36] For the reasons which follow, I conclude that an allocation of fees should be based on the relative contributions that each law firm provided to the Class. The exception is for McKenna, Long & Aldridge who will be awarded fees on a lodestar basis. Accordingly, I respectfully decline to enforce the 1996 Letter Agreement. Instead, I look to allocating the attorneys' fees in accordance with each firm's contribution during the various phases of the case. In so doing, I elaborate on the "good cause" I find to not enforce the 1996 Letter Agreement.

**b. Allocation of the Professional Services Into Two Periods**

Over the fourteen years this case had been pending, five law firms have provided legal services to the Class and now seek compensation. Three of those law firms, the Law Offices of Gerald Bowen, Grutman Greene and Humphrey, and the successor to the Denver firm of McKenna Cuneo, left the case many years ago. One law firm, now known as Pertnoy, Solowsky & Allen, was part of the legal team during each of its phases. Stearns, Weaver was brought into the case in October 1996, initially in the limited role of "trial coun-

sel" but took over the case in all major aspects in early 1997.

In applying the *Camden* and *Johnson* factors to the fourteen years of litigation, I conclude that a rational process for determining the relative contributions of the five law firms seeking an award of attorneys' fees in this case must begin with a division of the labor as a whole into smaller and workable parts. Although I did not preside over this case in its early years, I have reviewed the entire file, the affidavits offered by the parties, and have considered the testimony offered at the evidentiary hearings. I am intimately familiar with the case after it was assigned to my Division in 1999. Given these circumstances, I can rationally decide how an allocation can be made to fairly represent the contributions of the lawyers in the case.

The allocations reached are derived after considerable analysis of the various positions offered by the law firms involved in this dispute. The firms offered different versions of their contributions which starkly differed from one another. I have reconciled these differences based my view of the more credible and persuasive evidence, and also my own personal observations and experience. I conclude that, for purposes of allocating attorneys' fees, the case should be divided into two phases.

■ The first phase is the period of 1992 through 1997, being the filing of the initial Complaint and concluding with the entry of Stearns, Weaver into the case and its subsequent "redirection" in 1997.[37] The second phase is from the period of "redirection" in 1997 to date. I further

---

ty, and not contract. *Boeing Co.*, 444 U.S. at 478, 100 S.Ct. 745 (attorneys' fees in common fund cases are allowed by virtue of an equitable exception to the American Rule that prevailing parties are not awarded attorneys' fees).

**36.** Because I find "good cause" on these grounds, I do not reach the issue as to whether the 1996 Letter Agreement violated the Florida Bar Rules of Professional Conduct.

*See* Florida Bar Rule 4–1.5(g) (providing "... a division of fee between lawyers who are not in the same firm may be made only if the total fee is reasonable and the division is in proportion to the services performed by each lawyer.")

**37.** The redirection period began in October 1996 when Stearns, Weaver replaced McKenna Cuneo. Subsequent to that date, Stearns,

conclude that the first phase should be allocated only twenty percent of the total award, and that the second phase should be allocated the remaining eighty percent. Of the eighty percent, I conclude that Stearns, Weaver is to be awarded seventy-five percent and Pertnoy and Solowsky should be awarded five percent. As to the first part, Bowen/Grutman/Pertnoy & Solowsky will divide the twenty percent in proportion to the percentages envisioned in the 1996 Letter Agreement in that these percentages (as adjusted) best represent their own assessment of contributions through the first period.[38] After considering the totality of the evidence submitted, I independently conclude that such an allocation is fair and reasonable given the factors I must consider.

 McKenna, Long & Aldridge LLP (then McKenna & Cuneo)(hereinafter "McKenna") was not a signatory to the 1996 Letter Agreement. Nonetheless, the 1996 Letter Agreement stated that payment to them would be negotiated upon a successful conclusion, and absent agreement, it was contemplated that the court would award them fees based upon "some *quantum meruit* claim." Despite efforts, no agreement has been reached relative to their fees.

In their Petition, McKenna requests an attorneys' fee in the amount of $1,032,695.00 based on a lodestar analysis. McKenna's affidavits support a total of 4,338 billable hours of work on the case. Their fee calculation applies rates that reflect the lost time value of the fees. This approach has been recognized as appropriate by the Eleventh Circuit. *See Camden I*, 946 F.2d at 775 n. 7. No party contests the amount requested or the lodestar methodology applied. After independent review, I conclude that McKenna's fee application is well-founded and is consistent with a result based on *quantum meruit*. Accordingly, $1,032,695.00 will be awarded to McKenna as attorneys' fees.

 Next, I conclude that the Farrell & La Mantia Law Firm is entitled to no attorneys' fees because its petition was not timely filed, and because it contributed nothing of substance to this case.[39] At

---

Weaver redirected Plaintiffs' claim to a "pricing case" and Bowen withdrew.

**38.** The split in accordance with the 1996 Letter Agreement was 47% for Pertnoy and Solowsky; 25% for Bowen, 3% for Grutman, and 25% for Stearns, Weaver. For reasons stated in this Order, I remove Stearns, Weaver from the 1996 Letter Agreement and reallocate its 25% percent among Pertnoy and Solowsky, Bowen and Grutman. The proportional reallocation results in the following revised percentages: Pertnoy and Solowsky–62.67%; Bowen–33.33%, and Grutman–4%. The revised percentages total 100%. These percentages will apply to the twenty percent I allocated to the first phase of the litigation.

In my view, the revised reallocation for this phase is consistent with the greater weight of the evidence. I base this conclusion on my own review and assessment of the record of the first phase of this litigation. It is also consistent with the attorneys' own assessment as contained in the 1996 Letter Agreement which I credit as a factor. Although Stearns, Weaver/Grutman/Bowen argue that Pertnoy and Solowsky's participation in this first phase is overstated in the 1996 Letter Agreement, and that a greater allocation should be given to Bowen and Grutman, I conclude otherwise. I place considerable weight on Pertnoy and Solowsky's contributions as included in their Annotated Declaration [DE # 2635]. I discount Stearns, Weaver's analysis of Pertnoy and Solowsky's role during this first phase based on the obvious animosity between the law firms.

**39.** By Order dated November 2, 2004 [DE # 1760], I required that all petitions for attorneys' fees were to be filed no later than February 1, 2005. On February 3, 2005, I extended the date for filing of attorneys' fee petitions until August 1, 2005 [DE # 1805]. On September 30, 2005, I permitted "supplemental briefs" to be filed on issues identified by the Court at the prior status conferences

the evidentiary hearing, Richard Farrell testified that his advice contributed to Plaintiffs' winning the second trial. I conclude that this testimony is contrary to the greater weight of the more credible evidence.[40] I further disregard as unconvincing his reliance on the deposition testi-

[DE # 1760 at 2]. By Order dated February 7, 2006, I extended the filing date for "supplemental affidavits" until Friday, April 14, 2006 [DE # 2613]. I did not, by this Order, extend the deadline for filing of attorneys' fee petitions, as suggested by the Farrell Law Group. Here, the petition by the Farrell Law Group was filed on February 13, 2006, more than six months after the deadline of August 1, 2005. The Farrell Law Group did not move for leave to file a late petition or offer any good cause to excuse its late filing. I categorically reject the Farrell Law Group's argument that the "... time schedule established for the submission of applications for attorneys' fees was held in abeyance due to the settlement discussions between the Plaintiffs and Exxon Corporation" [DE # 2626 at 2]. The date for filing attorneys' fee petitions was not held in abeyance by any order of this Court. Rather, the date for filing supplemental affidavits in support of timely filed attorneys' fee was extended.

40. Farrell & La Mantia was paid a fee in the amount of $15,000 at the time it performed work for certain of the Class Representatives in preparation for the retrial. It now contends that, in addition to the payment of its fixed fee of $15,000.00 for an "initial review," it expended 251.5 additional hours in representing the interests of the Class. It claims, on a lodestar basis, an additional fee of $60,-450.00.00. At oral argument on June 26, 2006, Richard Farrell contended that his firm should receive over a million dollars in attorneys' fees. The firm's petition purports to apply the *Camden I* factors, claiming that its efforts were critical to the successful outcome of this litigation. I find the claim for one million dollars to be shocking.

Up until the date of its petition for attorneys' fees, Farrell & La Mantia had filed no appearance in the case. The firm was not retained by the Class, as compared to the Virginia Class Representatives, to evaluate Stearns, Weaver's performance during the first trial. I conclude that it was William McGillicuddy who proposed that Farrell & La Mantia be involved in the retrial. This is the same William McGillicuddy who failed to disclose his fee sharing arrangement with Gerald

Bowen to the other Class Representatives and to this Court. This is the same William McGillicuddy who had a direct conflict-of-interest in removing Stearns, Weaver as Class Counsel in order to protect his fee arrangement with Bowen.

The greater weight of the evidence establishes that the Farrell & La Mantia law firm was never retained by the Class after the conclusion of a series of meetings which occurred prior to the retrial. Notwithstanding, Farrell & La Mantia now claims that its significant contribution to the result is readily evident from its Exhibits A–5, A–6 and A–7. I have carefully reviewed these exhibits and conclude that Mr. Farrell's contribution is without any significance whatsoever to the retrial and the outcome of the case. I conclude that no additional fee, in addition to the $15,000.00 fixed fee, is appropriate or warranted. Yet, Farrell & La Mantia claims that it had brought "decades of experience" in litigating petroleum cases throughout the country to help refocus the Plaintiffs' case. After reviewing, the firm's exhibits, it appears obvious to me that Richard Farrell did not understand the complexities of this case at all. This is evidenced by Farrell's major conclusion in his Exhibit A–7 where he states: "CONCLUSION WITH OVERIDING (sic) THEME OF CASE, WHETHER PEOPLE, INCLUDING LARGE COMPANIES, SHOULD KEEP THE PROMISES THEY MAKE WITH THE PEOPLE THEY DO BUSINESS WITH (ETC.)." For this type of elementary legal work, Farrell & La Mantia now claims additional fees. In its verified petition, it inexplicably states that: "It is therefore unlikely that the outcome would have been favorable without the efforts of F. & L, with regard to preparations for retrial." The best that I can say about Farrell & La Mantia's petition is that it is specious, frivolous and incredible. In so holding, I am not concluding that a law firm which neither filed an appearance, nor attended a single hearing could not be entitled to an award of an attorneys' fee in a class action case. Rather, I conclude that the law firm of Farrell & La Mantia did nothing of substance to earn an award of any attorneys' fee in these proceedings.

mony of McGillicuddy for support of his attorneys' fee petition. I disregard McGillicuddy's testimony as not credible and against the manifest weight of the evidence. I waste no further effort commenting on the Farrell petition and its late entry into the attorneys' fee allocation proceedings.

### c. Reasons in Support of "Good Cause" for Disregarding the 1996 Letter Agreement and Requiring an Allocation Among the Law Firms

During first period, Gerald Bowen, Sidney Pertnoy and Jay Solowsky met with Exxon dealers, the Complaint was filed and amended, motions to dismiss were resisted, the Class was at first conditionally certified and later fully certified, and initial discovery was conducted.[41] I do not underestimate what was involved, and achieved, in filing this case, surviving the initial motions to dismiss, obtaining class certification, and undertaking, and analyzing the complex discovery initially obtained. Appropriate weight needs to be given to these early efforts and also to the attorneys' views of their own historical

contributions as assessed and memorialized in the 1996 Letter Agreement.[42] Nonetheless, I conclude that the significance of this first period to the overall result in this case is manifestly overstated by Bowen/Grutman/Pertnoy & Solowsky. At the same time, I conclude that Stearns, Weaver's minimization of the accomplishments of the first phase of the case understates its importance to the whole.[43]

### 1. Grutman and Farrell

Grutman ceased involvement in the case in 1995,[44] although Jewel Grutman has claimed participation during the subsequent periods. Although the 1996 Letter Agreement allocated only three percent to Grutman, Jewel Grutman now claims she has performed significant services for the class at the request of the Class Representatives in observing the first trial and advising on preparation for the second trial. She claims that she is now entitled to four percent of the *entire* fee award. I conclude that Jewel Grutman has contributed nothing of substance to the case, and that her claim, based on her participation after her husband's death, and its significance to

41. The initial complaint was filed on May 13, 1991 and the amended complaint was filed in February 1993. The Plaintiffs engaged in extensive motion practice with Exxon during the initial years before the case became at issue. Exxon filed six motions to dismiss and six full or partial summary judgement motions between November 1992 and May 1999. The Plaintiffs' attorneys also did significant work to obtain class certification and had engaged in extensive pretrial discovery as well as an extensive discovery motion practice before Stearns, Weaver appeared in the case. I place considerably more weight on obtaining class certification than does Stearns, Weaver.

42. At the evidentiary hearing on allocation of attorneys' fees, Jewel Grutman testified that the Grutman firm should be entitled to an award of 25% in the event the Court allocated a certain percentage to the first phase of the litigation. I reject her testimony as being

inconsistent to my assessment of Mr. Grutman's contribution to the first phase of the litigation and to the case as a whole. The prior 25% allocated to him in the fee agreement preceding the 1996 Letter Agreement assumed his full participation as the senior litigator. His role, however, greatly diminished due to his illness and untimely death.

43. Stearns, Weaver claims that it is entitled to 82.827% of the fee award. In its proposed allocation chart, Stearns, Weaver recognizes that Pertnoy and Solowsky performed more than 4.7% of the work from the time of "redirection" through the Claims Administration Process. My own assessment does not significantly differ from that of Stearns, Weaver. My difference with Stearns, Weaver's proposed allocation is that it undervalues the initial phase of the litigation.

44. Grutman entered the case in July, 1991. He died on June 26, 1994.

the outcome of the case, totally lacks merit and is contrary to the manifest weight of the more credible evidence. Like the Farrell & La Mantia firm, she claims credit for contributing to the redirection, and the viability of the case, between the first and second trial. Jewel Grutman's claim has no more substance than does the claims of the Farrell & La Mantia firm. In my view, the Plaintiffs were successful in the second trial because the first trial provided the "discovery" that Stearns, Weaver lacked after accepting representation. It was successful because Stearns, Weaver was able to directly impeach key Exxon fact witnesses and to discredit Exxon's expert witness who was critical to Exxon's defense. The result had nothing to do with the "redirection" claimed by Farrell & La Mantia, Bowen, and Jewel Grutman.

### 2. Bowen/Pertnoy & Solowsky/Stearns, Weaver

Bowen ceased participation in the case in the first half of 1997, but has filed papers claiming that his involvement was significant after that time. I conclude that his claim of meaningful participation subsequent to 1997 totally lacks merit, and,

like Jewel Grutman's claim, is contrary to the greater weight of the more credible evidence. I further discuss Bowen's claim later below.

While Pertnoy & Solowsky have retreated from their claim to enforce the 1996 Letter Agreement, Grutman and Bowen have not.[45] For the reasons I already have discussed, I reject enforcement of the 1996 Letter Agreement on their behalf. To award any of them such a fee would result in a disproportionate and patently unjustified attorneys' fee. None of the so-called facts they assert support any finding of entitlement. To the contrary, the manifest weight of the evidence supports a much more limited award to each.

At the time the 1996 Letter Agreement was executed, the case was set for trial. A limited period of discovery remained. I give weight to Stearns, Weaver's representations that when they entered into the 1996 Letter Agreement, they reasonably believed, based on the limited information made known to them at the time, that the case was essentially "trial ready."[46] I further conclude that they are correct in stating that it was not. Nor, in my view, was it in a "winnable posture"[47] when it was

45. While Bowen insists that the 1996 Letter Agreement should be enforced, he acknowledges that Stearns, Weaver should receive a large share. He argues that it should come from Pertnoy & Solowsky due to its failure to provide the "army" of lawyers which was supposed to be the basis for Pertnoy & Solowsky's larger share in the first instance. Pertnoy & Solowsky, in turn, acknowledges that Stearns, Weaver should receive more than the share allocated in the 1996 Letter Agreement, and that this increased share should come from both Bowen who quit the case. Even Grutman acknowledges that Stearns, Weaver should receive a larger share, but argues that this increase should come from both Bowen, who left the case, and Pertnoy & Solowsky, which failed to fulfill its duties.

46. The more credible evidence establishes that, at the time of the signing of the 1996 Letter Agreement, Stearns, Weaver was told

that it had only to take some merits depositions and to then to try the case. Sidney Pertnoy represented that his firm would remain "coordinating and litigation counsel in the management of the case" responsible for the staff and overhead of the litigation on a day-to-day basis. Bowen would continue in his role as "navigator" on all petroleum marketing issues, both legal and factual. None of these representations proved true. There was no discussion of dividing either work or fees for appeals or a Claims Administration Process.

47. Gerald Bowen evidently reached the same conclusion in his communication to co-counsel prior to Stearns, Weaver's entry into the case. On June 20, 1996, just several months before the signing of the 1996 Letter Agreement, Bowen wrote his "sinking ship" memorandum to Pertnoy & Solowsky and McKenna

turned over to Stearns, Weaver in 1996.[48] I conclude that Bowen and Pertnoy & Solowsky significantly underestimated what was required to effectively proceed to trial and beyond. As it turned out, much more was required of the Stearns, Weaver than what was envisioned as their "professional future contributions" in the 1996 Letter Agreement.

For Pertnoy & Solowsky/Bowen/Grutman to simply argue *caveat emptor* misses the point. No reasonable law firm would have been able in a few weeks in 1996, through due diligence, to have a complete comprehension of the work that had been done over the prior five years and the work that remained to be done. Many of the problems and deficiencies only became obvious as the case proceeded toward trial. Regretfully, more deficiencies have been disclosed during the evidentiary hearings on the allocation of attorneys' fees.

Perhaps if the case went forward to trial before Judge Kehoe, the "overall historical and professional future professional contributions," as envisioned in the 1996 Letter Agreement, would have been more accu-

rate. This, however, is not how the case evolved. Based on my own observations, and the greater weight of the more convincing credible evidence, I conclude that, from the time Stearns, Weaver entered the case, their contribution manifestly eclipsed that of any other firm, and far exceeded the assignment of work in the 1996 Letter Agreement, as it proceeded through numerous motions for summary judgment (before me), numerous motions *in limine*, a week long *Daubert* evidentiary hearing, two trials, the appeals, the Claims Administration Process, and the Settlement. To limit Stearns, Weaver to the 25% contemplated by the 1996 Letter Agreement simply provides an unwarranted windfall to other counsel at Stearns, Weaver's expense and to the detriment of the Class.

It would be blatantly and grossly disproportionate to the actual work undertaken, and contrary to the reality of who obtained the actual benefits for the Class.[49] It would also be a detriment to the Class because it would create a disincentive to Stearns, Weaver to complete their work in favor of each Class member in the Claims Administration Process, in accordance with the terms of the Settlement Agreement.[50]

---

partner Cortes, complaining that no one but Bowen was willing to work, that the lawyers were primarily focused on fee allocation, and that, as a consequence, the case was a "sinking ship." This memoranda was not disclosed to Stearns, Weaver during their due diligence review.

**48.** At the time Stearns, Weaver entered the case, the prior Plaintiffs' law firms had not retained an expert, had not taken merits depositions on critical issues, and had failed to request some of the most essential records required to prove Exxon's breach and the Class' damages.

**49.** Thus, for instance, two of the law firms claiming a total of 2% of the total fee abandoned the case years ago.

**50.** I further conclude that Stearns, Weaver was faced with a significant dilemma. As the case unfolded, Stearns, Weaver could hardly

request this Court to resolve their attorneys' fees issues without significantly prejudicing the Class. Nor was Stearns, Weaver in a position to renegotiate the 1996 Letter Agreement or to threaten to withdraw from representation in this matter. All such actions would have been detrimental to the Class. Lawyers who undertake the duty of class counsel in the federal court assume a "heavy duty" to the Class, the Court, and to the public, who supply the resources which enable the prosecution of such suits. *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir. 1985). Stearns, Weaver scrumptiously met their duty. Their only proper and professional choice was to continue representation with the expectation (and hope) that the matter would later be resolved and their efforts recognized. I commend them for their professionalism in assuming a duty to the Class superior to themselves.

On May 3, 2006, Pertnoy and Solowsky forwarded to this Court a supplemental cita-

Significant weight must be given to the fact that Stearns, Weaver will remain as sole Class Counsel under the Settlement Agreement, and, in accordance with this Order, must await their full compensation, while Pertnoy & Solowsky, and other early Class Counsel, will be excused with full payment of their proportionate share of the attorneys' fee award.

While Pertnoy & Solowsky argue that they worked "shoulder to shoulder" and "behind the scenes" with Stearns, Weaver, and shared the work equally, the more credible and convincing evidence supports the contrary conclusion. Following Stearns, Weaver's entry into the case, the most active work undertaken by Pertnoy & Solowsky has been in relation to their attorneys' fee application. Otherwise, Pertnoy & Solowsky's role in the litigation following its "redirection" has been very limited. Merely "showing up" and sitting in court, or at strategy sessions, does not constitute an equal sharing of the workload. Notwithstanding the number of hours purportedly spent by the firm during the second phase of the case, I conclude that Pertnoy & Solowsky's substantive contribution does not exceed five percent of the allocation for the second phase of the case. The five percent allocated to them recognizes their contribution during the second trial and in the Claims Administration Process.

During his testimony, Mr. Pertnoy suggested that the "cost contribution" made by his law firm justifies a "fifty-fifty" allocation between the two firms.[51] I reject this contention because it is not substantiated by the greater weight of the more credible evidence, and, in any event, even if true, does not alter my view of an appropriate allocation. Regardless of who paid what, Pertnoy & Solowsky's role became negligible when Stearns, Weaver entered the case. The near totality of the real legal work, from the time of "redirection" in 1997 through the Claims Administration Process and the Settlement, was performed by Stearns, Weaver.[52] I also give

tion, *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235 (2d Cir.2006), apparently to support an argument that Stearns, Weaver waited too long to assert a "rescission claim," and, therefore, should be barred from doing so now. This case did not involve a class action and essentially applied New York contract law. Given Mr. Pertnoy's testimony at the allocation hearings, I am unsure why this supplemental citation was provided to this Court. It has no precedential or factual application here.

51. At closing argument on June 26, 2006, Pertnoy and Solowsky's attorney argued, for the first time, that a fifty-fifty split is appropriate based on a comparison of risk factors and adjusted lodestar during the pertinent time periods. I reject this analysis as being baseless for two reasons. First, I place little reliance on Pertnoy and Solowsky's lodestar assessment. Second, I disagree with Pertnoy and Solowsky's assignment of greater risk factors attributable to the earlier part of the case. To the contrary, the risk factors increased significantly after the first trial, the appellate process and during the Claims Ad-

ministration Process. For instance, prior to the Settlement Agreement, the award of attorneys' fees was tied directly to the success of the Claims Administration Process which was hotly contested. I conclude that the "risk factors" weigh heavily in favor of Stearns, Weaver and certainly do not support a fifty-fifty split as advocated by Pertnoy and Solowsky.

52. The period before the first trial was particularly demanding for the attorneys and on the Court. When I assumed responsibility of the case, I requested both the Plaintiffs and Exxon to provide a schedule that would result in a specific trial date. The date selected, and the work proceeding trial, placed significant burdens on the parties and the Court. While Stearns, Weaver sometime complained that I "re-tried" matters already decided by Judge Kehoe, I concluded that such an effort was necessary because I did not agree with all of Judge Kehoe's conclusions in the early summary judgment order, and because an "never ending" array of legal issues had to be resolved prior to the first trial. I credit Stearns, Weaver's efforts during this period.

significant weight to Stearns, Weaver contribution to the Class Members, both known and unknown, by adroitly involving the State Attorney Generals of twenty-one states in the Claims Administration Process. This effort was extraordinarily beneficial to accomplishing the settlement with Exxon because, as a result, Exxon was confronted with a majority of the States potentially recovering the remaining unclaimed damages. Without Stearns, Weaver's role, this benefit would not have been realized.[53]

Because of their early contributions in this case, I respectfully decline to engage in "fact finding" on all of Stearns, Weaver's positions against Pertnoy & Solowsky. It serves no purpose to embarrass anyone further. Suffice it to say, I find merit in Stearns, Weaver's position that, following the redirection of the case in 1997, Pertnoy & Solowsky's fundamental concern was to obtain "public recognition" of the results achieved in favor of their firm[54] and to protect their claim to a disproportionate fee under the 1996 Letter Agreement. Even if I engage in detailed fact finding, I would simply come to the same conclusion. Pertnoy & Solowsky's contribution to the second phase of the case constitutes only five percent of the eighty percent I have allocated. Without Stearns, Weaver's contribution to the case, Pertnoy & Solowsky would not be receiving an attorneys' fee

allocation of more than $50,000,000.00, which, in my view, more than generously compensates them for the entirety of their efforts.

### 3. The Conflict-of-Interest of Bowen and McGillicuddy

The situation with Gerald Bowen has become more complicated. Without doubt, he significantly contributed to the first phase of the case, and was recognized for his efforts in the 1996 Letter Agreement. Absent the circumstances that I now describe, Mr. Bowen would be entitled to a percentage award for the first phase of the case in the manner as contemplated in the 1996 Letter Agreement and as adjusted by this Court. Regretfully, it has now been disclosed that both Bowen and McGillicuddy have had significant, and self-evident, conflicts-of-interests that warrant partial forfeiture.[55]

Since the beginning of the case in 1992, Bowen has borrowed in excess of $400,000.00 from McGillicuddy to cover his personal and business expenses and to help finance his participation in this case. In early 2000, he entered into a written agreement with McGillicuddy in which Bowen agreed to pay McGillicuddy the lesser of $13 million or 50% of any attorneys' fees he would receive in this proceeding. He further testified that he

---

**53.** I recognize the individual contributions made by Eugene Stearns and the lawyers and staff at the Stearns, Weaver law firm. Even his co-counsel, with whom he is now in dispute, acknowledge Mr. Stearns' individual role in this case as extraordinary. I join Mr. Stearns in recognizing the unique contribution of Mr. Tony Menendez, a member of Stearns, Weaver, in proving the pricing case. Unfortunately for all concerned, Mr. Menendez, like Roy Grutman, died during this litigation. Their prior efforts are appreciated by all Plaintiffs' attorneys and the Class Members.

**54.** Stearns, Weaver argues that Pertnoy and Solowsky had successfully manipulated West Publications in a manner to create the false impression that their law firm was lead counsel and significantly contributed to the results reported in published opinions. The greater weight of the more credible evidence unfortunately supports this conclusion. I have considered this factor in my "good cause" analysis.

**55.** Stearns, Weaver advocates a forfeiture against Pertnoy and Solowsky. I find no basis for forfeiture against them and deny the request.

subsequently had a falling out with McGillicuddy, that McGillicuddy sued him in Virginia state court, and that McGillicuddy now has a final judgment dated March 16, 2005 against him for $13 million, plus interest at 22% per year, but not exceeding 50% of his fee award in this proceeding.[56] McGillicuddy and Bowen deny that this judgment incorporates a "fee sharing" agreement, but the manifest weight of the evidence supports the contrary conclusion.

None of these circumstances were disclosed to Stearns, Weaver, to the other Class Representatives or to this Court. Instead, these matters only became known through discovery associated with these allocation hearings. Specifically, Bowen has filed affidavits in support of enforcing the 1996 Letter Agreement, and to justify his "significant" contribution to the case, including after the first trial, without disclosing the fee sharing arrangement with McGillicuddy. Likewise, McGillicuddy has executed affidavits in these proceedings in support of his own position for a disproportionate incentive award and in support of enforcing the 1996 Letter Agreement, without revealing his personal interest in Bowen's fee. I conclude that McGillicuddy knew before he entered into his written

agreement with Bowen that Stearns, Weaver was dissatisfied with the 1996 Letter Agreement and planned to request the Court to reallocate attorneys' fees based on each law firm's total contribution to the case.

After entering into his written agreement with Bowen, McGillicuddy, in collaboration with Bowen, took steps to replace Stearns, Weaver and to bring Richard Farrell into the case following the "hung jury" on the first trial. The circumstantial evidence strongly supports the inference that Richard Farrell would agree to a fee arrangement acceptable to Bowen and McGillicuddy. Also, both Bowen and McGillicuddy had every reason to believe that Stearns, Weaver would seek to withdraw in the event Richard Farrell entered the case. McGillicuddy denies that he intended to replace Stearns, Weaver but I do not credit his testimony. The inference is too compelling that, at this point, both Bowen and McGillicuddy were more concerned with protecting the fee percentages under the 1996 Letter Agreement than in acting in the best interest of the Class.

The fact that neither Bowen nor McGillicuddy disclosed their written agreement to Class Counsel or to the other eight Class

---

**56.** McGillicuddy claims that Bowen borrowed in excess of $408,000.00. The agreement was that, from a contingency fee award, Bowen would repay to him double the amount of all sums advanced, with interest at 22% per year, plus $12,500,000, but not to exceed 50% of the fee recovered by Bowen. The parties agreed that their agreement would remain confidential. Thereafter, McGillicuddy claimed that Bowen breached their agreement by making it and its terms known to third parties and by repudiating the agreement. McGillicuddy sued Bowen in Virginia state court and obtained a default against Bowen and a declaratory judgment from the state court. The final judgment concludes that "... Gerald Bowen [is] legally obligated to pay ... William R. McGillicuddy (in consideration of certain services, which had been

and were to be rendered by the Complainant and the funding of a loan, the proceeds of which the Complainant had and was to provide the Respondent from time to time), a sum which now totals $13,308,000 (not including sums paid since the filing of the Bill of Complaint in this matter) with interest at 22% on $808,000.00 of said total, with the interest on said sum commencing on December 10, 20004, and continuing thereafter until paid, subject to the award of attorney fees to the Respondent in the case of *Allapattah v. Exxon,* 91–0986–Civ–Gold, which is now pending in the United States District Court for the Southern District of Florida; but in no event is the Complainant entitled to receive more than 50% of the amount awarded to the Respondent...."

Representatives supports this conclusion. Even without that information, several Class Representatives resisted Bowen and McGillicuddy's efforts to bring Richard Farrell into the case. They had the good sense to conclude that it would not have been in the best interest of the Class. Furthermore, withholding of their fee-sharing agreement, and the Virginia judgment, from Stearns, Weaver placed the second trial at risk in the event Exxon had discovered this information and used it for impeachment purposes during the second trial.

■ For Bowen, his clear conflict-of-interest violated the rules of this Court which incorporate the Florida Bar Rules. See Rule 11.1(c), Local Rules of the United States District Court for the Southern District of Florida ("The standards of professional conduct of members of the Bar of this Court shall include the current Rules Regulating the Florida Bar."); *see also* Rules 4–1.7 and 4–1.8 of the Rules of Professional Conduct of the Florida Bar (governing conflicts-of-interest), Rule 4–4.1 (truthfulness in statements to others), and Rule 4–3.3 (candor towards the tribunal). Class Counsel must not, on threat of sanction, use the class action for his own personal aggrandizement, ignore conflicts, or prejudice the class by self-interested misbehavior. *See Piambino*, 757 F.2d at 1144–45 & n. 88. I conclude that Bowen acted with self-interested misbehavior in this case.[57]

McGillicuddy also had a fiduciary duty to the Class. As stated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949):

> "A [class representative] assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated. The interest of all in the redress of the wrongs are taken into his hands dependent upon his diligence, wisdom and integrity.... He is a self-chosen representative and a volunteer champion. The Federal Constitution does not oblige the State to place its litigating and adjudicating processes at the disposal of such a representative, at least without imposing standards of responsibility, liability and accountability which it considers will protect the interests he elects himself to represent. It is not without significance that this Court has found it necessary long ago in the Equity Rules and now in the Federal Rules of Civil Procedure to impose procedural regulations of the class action not applicable to any other...."

*Id.* at 69 S.Ct. at 1227.

Applying these fundamental principles, I conclude that McGillicuddy acted in violation of his fiduciary duty. In many respects, he has shown excellent traits of a class representative, including great courage and tenacity. It is regrettable that,

---

**57.** At the June 26, 2006 closing argument, and as expressed in earlier motions, Bowen claims that he was somehow denied due process in these proceedings. He claims that he needed more time to present all his evidence. I conclude his claim in not well-founded. Unlike any other lawyer in this case, Bowen was specifically awarded $300,000 by order of this Court, dated November 11, 2005, so that he could fully participate in these proceedings. These monies were transferred to him on November 29, 2005. Bowen then used most of the money to pay off a forfeiture of his house rather than to perfect his claim in this case. After listening to his testimony during the allocation proceedings, I concluded that Bowen could offer nothing more of substance if he had been given more time to present his evidence. I find that his contrary argument lacks credibility and any substantive support.

for his own purposes, he also pursued his own self-interest.

### 4. Partial Forfeiture

Stearns, Weaver, on behalf of the Class, urges that I forfeit the entirety of McGillicuddy's incentive award. He is joined in that request by Class Representatives Pinder, Luis and Gonzalez. Class Representative Durishin urges forfeiture "to some extent," but that "total forfeiture" would be inappropriate due to McGillicuddy's overall contribution to the case, including his contribution of over $100,000.00 in out-of-pocket costs. Class Representatives Bove, Cook, Dalton and Wise urge that forfeiture should be limited to McGillicuddy's loss of the right to request a disproportionate award.

 Fee forfeiture is an equitable remedy that requires careful consideration of all the relevant circumstances. *See In Re Austrian and German Bank Holocaust,* 317 F.3d 91, 102 (2nd Cir.2003). For the reasons that I state below, I conclude that a limited forfeiture is appropriate. Putting aside the fee-splitting agreement, I cannot ignore that both Bowen and McGillicuddy have provided substantial contributions to this case which have directly benefitted Class Counsel, other Class Representatives and Class Members. At the time Bowen entered his written fee-splitting agreement with McGilli-

cuddy, he was not actively representing the Class. Nonetheless, while he was actively representing the Class, he had borrowed substantial sums of money from McGillicuddy. He did not notify the other Class Representatives or other Class Counsel about his arrangement. Moreover, during that time period, he pursued claims against Exxon more beneficial to McGillicuddy than to the Class as a whole. By doing so, he ignored and breached his "heavy fiduciary responsibility to his clients." *See Piambino,* 757 F.2d at 1138.[58]

He also sought to reinstate himself in the litigation as the "navigator," after the second trial. McGillicuddy actively supported his effort. He further advocated that Richard Farrell should take over as litigation counsel for the second retrial, again, without disclosing his real interest in removing Stearns, Weaver from the case—that is, because Stearns, Weaver was not willing to abide by the 1996 Letter Agreement. Again, Bowen made no disclosure of his arrangement with McGillicuddy at the time at the time he promoted Richard Farrell. Most significantly, Bowen filed a fee application with this Court and did not disclose his arrangement with McGillicuddy or the judgment against him. Similarly, McGillicuddy made no such disclosure to this Court in his application for incentive awards. At the evidentiary hear-

---

**58.** Where false filings and perjured testimony are advanced, forfeiture is an appropriate remedy-and, in some instances, is mandated. *See Piambino,* 757 F.2d at 1141; *see also In re Austrian & German Bank Holocaust Litig.,* 317 F.3d 91, 102 (2nd Cir.2003)(recognizing forfeiture as a remedy for violation of fiduciary duty to class); *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1156 (8th Cir.1999)(affirming disqualification of class counsel for violation of fiduciary duty and denial of recovery of any fees even if services provided some benefit); *Lowenschuss v. Bluhdorn,* 78 F.R.D. 675, 678 (S.D.N.Y.1978)(disqualifying class counsel for breach of fiduciary duty resulting from fee

arrangements demonstrating counsel's preoccupation for large fee). Federal courts have also imposed the remedy of forfeiture in non-class actions cases involving breaches of fiduciary duties to clients or the court, or a result of the submission of exaggerated or false fee petitions containing fabricated or double billed hours and inflated billing rates. *See, e.g., Futuronics Corp. v. Arutt, Nachamie & Benjamin,* 655 F.2d 463, 470–71 (2nd Cir.1981)(forfeiture for breach of fiduciary duty owed bankruptcy court); *Keener v. Department of Army,* 136 F.R.D. 140 (M.D.Tenn.1991)(forfeiture for fabricated fee petition).

ings, neither offered a satisfactory explanation.

I resolve this difficult situation by imposing a partial forfeiture on Bowen and McGillicuddy. Regarding McGillicuddy, an incentive award is purely discretionary with the Court. I find that McGillicuddy has forfeited his right to seek a disproportionate incentive award from the Class itself. Instead, McGillicuddy must look to Bowen to pay his incentive award.[59] Moreover, I exercise my discretion by reducing his incentive award by twenty-five percent because of his bad faith in failing to disclose his fee-splitting agreement with Bowen while, at the same time, seeking a disproportionate incentive award in relation to the other Class Representatives. I have considered forfeiting all incentive awards to McGillicuddy. I refrain from doing so only because he was personally instrumental in bringing this case and has significantly contributed to the results achieved.

At the same time, I will neither sanction nor be a party to enforcing the Virginia judgment against Bowen.[60] I find the fee-splitting arrangement condoned by that judgment to be repugnant to the requirements of Fed.R.Civ.P. 23(h) governing the award of reasonable attorneys' fees.[61] The judgment also appears to be in violation of Virginia law because it imposes an usurious interest rate at double the amount of all sums advanced at 22% per year. Under Virginia law, no contract shall be made for the payment of interest on a loan greater than twelve percent per year. *See* § 6.1–330.55, Code of Virginia. The judgment rate of interest is at an annual rate of six percent. *See* § 6.1–330.54, Code of Virginia.

I will enjoin McGillicuddy and his corporation from collecting on that judgment against Bowen except for the monies Bowen actually borrowed, together with a lawful rate of interest in accordance with Virginia law.[62] I do so under the All Writs Act, 28 U.S.C. § 1651 (1982) which permits me to issue all writs and orders necessary and appropriate to preserve the Court's jurisdiction and to prevent frustration of the proper administration of justice.

I also so act under my "inherent powers" which are derived from the court's need "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991); *Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306, 1319 (11th Cir.2002); *Allapattah v. Exxon Corporation*, 372 F.Supp.2d at 1372. I conclude that both Bowen and McGillicuddy

**59.** I further find that McGillicuddy has forfeited any entitlement to an incentive award greater than that awarded to the other Class Representatives. Accordingly, I reduce his incentive award by twenty-five percent from the amount awarded to each of the other Class Representatives.

**60.** McGillicuddy has personally filed for an incentive award in this case in his own name and in the name of his wholly-owned company. The Virginia judgment is in his own name.

**61.** On May 30, 2006, McGillicuddy filed a "Notice of Partial Relinquishment of Virginia Judgment" whereby he now relinquishes any right to enforce the judgment in any amount in excess of $808,000.00 plus twenty-two percent (22%) simple interest commencing on December 10, 2003. For reasons stated above, I have significant concerns about the interest rate. I am leaving this issue for consideration by the Special Master in a separate report and recommendation on the amount that Mr. Bowen shall pay to Mr. McGillicuddy on the Virginia judgment.

**62.** I will request the Special Master to provide a report and recommendation on the amount of monies Bowen legitimately owes McGillicuddy and the interest due on such amount under the laws of the State of Virginia.

have acted in "bad faith" by failing to fully disclose their fee splitting agreement to Class Counsel, the other Class Representatives and by filing their affidavits in this Court without making appropriate disclosures. Because Bowen has acted in "bad faith," I also may consider his conduct in determining his ultimate attorneys' fee under Fed.R.Civ.P. 23(h). A finding of "bad faith" is warranted where an attorney knowingly or recklessly disrupts the litigation or provides false information to the Court. *Thomas,* 293 F.3d at 1320.

Based on Bowen's conduct, I reduce his attorneys' fee by twenty-five percent. I further penalize him by requiring Bowen to pay McGillicuddy's reduced incentive award from the share of the attorneys' fees awarded to Bowen. The reduced amount remains in favor of the Class and is not allocated to any other attorney or Class Representative. In addressing these sanctions, I conclude that due process requirements have been met. Both Bowen and McGillicuddy have had the opportunity to respond in writing and defend against the request for forfeiture. However, I would forfeit the entirety of Bowen's fee award and McGillicuddy's incentive award if the Order I have entered cannot be enforced for any legal reason. I make this alternative finding rather than to allow a fee-splitting arrangement which is repugnant to this Court. I also give notice to McGillicuddy that any willful attempt to enforce the Virginia judgment against Bowen's attorneys' fees in a manner inconsistent with this Order will result in an order to show cause why criminal contempt proceedings should not be filed against him.

### d. Findings on Net Amount for Attorneys' Fees and on Payment of Fees; Timing of Payments.

#### 1. Award of Attorneys' Fees and Incentive Awards

The Settlement Fund's gross amount is $1,075,000,000. From this amount, $15,000,000.00 is first deducted as attorneys' fees paid by Exxon in the three fee-shifting States. The $15,000,000.00 will be distributed *pro rata* among the Claimants in the three fee-shifting States. After this reduction, a total of $1,060,000,000.00 remains in the Settlement Fund.

I will reduce this amount by 1.5% as an incentive award for the Class Representatives in the amount of $15,900,000.00. This results in a net total of $1,044,100,000. I recognize that I have ordered Gerald Bowen to pay William McGillicuddy's incentive award, as adjusted, so that no portion of Mr. McGillicuddy's incentive award will be paid by the Class. Nonetheless, I conclude that neither the Class Representatives, nor Class Counsel should benefit as a result of the McGillicuddy and Bowen's forfeitures.[63] The remaining incentive awards will be paid equally to each of the eight Class Representatives in the amount of $1,766,666.00. McGillicuddy's equal share of the total incentive award, $1,766,666.00 is reduced by a forfeiture of twenty-five percent for a total of $1,325,000.00. Bowen will pay McGillicuddy the amount of $1,325,000.00.

---

**63.** Mr. Stearns, as Class Counsel, argues for a complete forfeiture of Mr. McGillicuddy's incentive award. The effect of such an action would be to increase the net amount available for allocation for attorneys' fees. This raises a potential conflict-of-interest which needs to be neutralized. I have done so by using the 1.5% figure to determine the total amount of incentive awards. As I have concluded that Mr. Bowen, and not the Class, should pay Mr. McGillicuddy's reduced incentive award, in effect, the Class will pay only 1.3% in total incentive awards to the remaining Class Representatives from the Settlement Fund. The amount of the reduced incentive award that would have been paid to Mr. McGillicuddy will remain in the Settlement Fund in favor of the Class.

Next, I reserve an estimated amount of $5,650,000.00 from the Settlement Fund for the reimbursement of costs.[64] A final cost calculation will be recommended by the Special Master after a hearing. If the total amount of costs is less than the estimated amount, then the amount of incentive awards and attorneys' fees will be adjusted proportionately consistent with this Order. The net result of the estimated reduction, however, results in a remaining total of $1,038,450,000.00 in the Settlement Fund.

Applying 31 and 1/3% to the remaining $1,038,450,000.00, the net amount available for attorneys' fees is $325,380,997.00. Of this amount, I have allocated twenty percent to Pertnoy and Solowsky/Grutman/Bowen (prior to adjustment as to Bowen) for the first phase of the litigation. This equals $65,006,199.00. I deduct from this amount a total of $1,032,695.00 to be awarded to McKenna. The remaining amount is $64,043,504.00. I then allocate this amount in the following percentages, as adjusted: Pertnoy and Solowsky–62.67% or $40,136,063; Bowen–33.33% or $21,345,699, and Grutman–4% or $2,561,740.

I reduce Bowen's share by twenty-five percent ($5,336,425.00) for a net total of $16,009,274.00. However, this amount is reduced by $300,000.00 which was previously provided to him as an advanced attorneys' fees by this Court's Order of November 18, 2005 [DE # 2514], for a revised total of $15,709,274.00. This amount is further reduced by $1,325,000.00 because Bowen is ordered to pay Mr. McGillicuddy his reduced incentive award. The revised total for Mr. Bowen is $14,384,274.00. I will reduce this amount further after considering the report and recommendation of the Special Master as to a further deduction for Bowen's prior debt to McGillicuddy.

The amount allocated to the second phase is $260,304,797.60. I have allocated Pertnoy and Solowsky five percent of this amount for a total of $13,015,240.00. The remaining amount of $247,289,557.00 is allocated to Stearns, Weaver as its attorneys' fee in this case. Pertnoy and Solowsky's total attorneys' fee award, combining its award from the first and second phases of this litigation, is $53,151,303.00.

### 2. Timing of Distributions; Credit to Class Members on Forfeited Fees

A further matter at issue is the manner of payment. There are four options. The first is to order that the attorneys and Class Representatives would be paid as a percentage of each claim as each claim is adjudicated. The second is to order that the attorneys and Class Representatives are to be paid from the Settlement Common Fund. The third is to order a combination of both methods, with some funds paid upon from the Settlement Common Fund and other amounts paid as claims are adjudicated. The fourth method to pay an amount from the Settlement Common Fund and hold back from final payment some portion pending the conclusion of the Claims Administration Process. I have elected the fourth method for the reasons stated below.

A primary concern is whether the payment of attorneys' fees, incentive awards, and past due costs in lump sum would jeopardize the necessary reserves to pay the anticipated cost of the Claims Administration Process. To analyze this issue, I directed the Special Master to obtain the

---

64. Past costs and expenses already incurred will be paid from this amount upon recommendation by Special Master Scott. All future costs and expenses will be paid from this amount as a draw after application for reimbursement, upon approval from Special Master Scott.

advice of a certified public accountant given the range of requested relief under the various pending motions and the available options for payment. Upon consideration of the Special Master's recommendation, I conclude that I can directly pay all of the attorneys' fees for the four law firms (McKenna, Pertnoy & Solowsky, Grutman and Bowen), one-half of Stearns, Weaver's attorneys' fee, all of the incentive awards, and the prior incurred costs, and still maintain a sufficient reserve for the Claims Administration Process. This approach has several advantages. First, this option will simplify the Claims Administration Process. Second, all attorneys, except for Stearns, Weaver, can be discharged as Class Counsel. Third, Stearns, Weaver, as the sole remaining Class Counsel, will have an incentive to expeditiously proceed with the Claims Administration Process in order to obtain their remaining attorneys' fee. In the meantime, the outstanding balance of their attorneys' fee will earn interest at the Florida statutory judgment rate. This amount will be paid to Stearns, Weaver before any distribution to the States. I also will permit Stearns, Weaver to file for an intermediate additional distribution of their remaining attorneys' fee when more than one-half of the total Class Members have received their distributions, provided that there are sufficient interest funds and reserves generated at that time to pay the remaining costs of the Claims Administration Process.

Finally, the partial forfeiture by Bowen and McGillicuddy has resulted in an additional $6,661,425.00 [65] being available for distribution. I have determined that it is in the best interest of the Class Members to receive a *pro rata* distribution of this amount at the time of final distribution at the conclusion of the Claims Administration Process. This amount will be distributed to the Class Members prior to any distribution to the States. I select this option because, under the Settlement Agreement, other final distributions to Class Members are contemplated at that time. The effect is to reduce the percentage of attorneys' fees actually paid by the Class from 31 and 1/3% to a smaller percentage.

## V. ORDERS OF THE COURT.

### WHEREFORE, it is ORDERED:

1. The Objections [DE # 2710] to the award of attorneys' fees and incentive awards are denied. Attorneys' fees will be awarded based on a percentage of 31 and 1/3% in a manner consistent with this Order. Incentive awards will be awarded based on a percentage of 1.5% in a manner consistent with this Order.

2. The motions by Pertnoy & Solowsky/Bowen/Grutman to enforce the 1996 Letter Agreement [DE # 1845, 1846 & 1848] are denied.

3. Stearns, Weaver's Opposition to Motions Seeking Allocation of Attorneys' Fees on a Basis Other Than Proportionate Contribution to the Class [DE # 1894] is approved. Consistent with this Order, attorneys' fees will be awarded based on the services rendered by each law firm to the Class.

4. Stearns, Weaver's Petitions for Attorneys' Fees [DE # 2124, 2126, 2637 & 2638] are granted in part. The law firm is awarded $247,289,557.00 in attorneys' fees. Payment of one-half of this attorneys' fee shall be paid forthwith by the Claims Administrator from the Settlement Fund. The remaining one-half of the attorneys' fee shall be paid as set forth in this Order.[66] I reserve on the Petitions to the

---

**65.** This figure is comprised of the 25% forfeiture ($5,336,425.00) taken from Bowen's original attorneys' fee award ($21,345,699.00) plus McGillicuddy's entire reduced incentive fee award ($1,325,000.00) which will be paid by Bowen (as reduced).

**66.** The Court notes that it is its intent to pay a reasonable amount of judgment interest on

extent that the Petitions request an award of costs and expenses pending recommendation by the Special Master.

5. Pertnoy & Solowsky's Petitions for Attorneys' Fees [DE # 2129, 2130 & 2635] are granted in part. The firm is awarded $53,151,303.00 in attorneys' fees. Payment of the entire amount of this attorneys' fee shall be paid forthwith by the Claims Administrator. I reserve on the Petitions to the extent that the Petitions request an award of costs and expenses pending recommendation by the Special Master.

6. Grutman, Greene & Humphrey's Petitions for Attorneys' Fees [DE # 2112, 2628 & 2629] are granted. The Grutman firm is awarded $2,561,740.00 in attorneys' fees. Payment of the entire amount of this attorneys' fee shall be paid forthwith by the Claims Administrator. I reserve on the Petitions to the extent that the Petitions request an award of costs and expenses pending recommendation by the Special Master.

7. Bowen's Petition for Attorneys' Fees [DE # 2174] is granted in part and denied in part. He is denied twenty-five percent ($5,336,425.00) of his attorneys' fee award because of partial forfeiture. Subtracting the twenty-five percent, Mr. Bowen's total would be $16,009,274.00. However, this amount is reduced by $300,000.00 which was previously provided to him as an advanced attorneys' fees by this Court's Order of November 18, 2005 [DE # 2514], for a revised total of $15,709,274.00. This amount is subject to further deduction for McGillicuddy's incentive award ($1,325,-000.00), as set forth in this Order, for a revised total of $14,384,274.00. This amount shall be subject to a further reduction following the recommendation from the Special Master as to the amount that

Bowen owes to McGillicuddy under the Virginia judgment, as set forth in this Order. The Special Master shall issue a report and recommendation as to an amount to paid for Mr. Bowen's debt to Mr. McGillicuddy in accordance with Virginia law. Accordingly, Bowen shall be paid only $5,000,000.00 in attorneys' fees forthwith by the Claims Administrator. The remaining amounts shall be paid to Bowen and McGillicuddy in accordance with further order of this Court.

8. McKenna's Petition for Attorneys' Fees [DE # 2108] is granted. The law firm is awarded $1,032,695.00 in attorneys' fees. The fee shall be paid forthwith by the Claims Administrator.

9. Farrell & La Mantia's Petition for Attorneys' Fees [DE # 2626] is denied in its entirety.

10. Stearns, Weaver shall remain as the sole Class Counsel to continue the Claims Administration Process. All other law firms are hereby discharged.

11. I reserve on the various cost petitions filed by the attorneys pending recommendation by the Special Master. Any further costs awards for future expenses shall be subject to further recommendation by the Special Master.

12. The Petitions for Incentive Awards filed by the nine Class Representatives [DE # 2109, 2116, 2118] are granted. Each Class Representative, except for Mr. R. William McGillicuddy, will receive an incentive award in the amount of $1,766,666.00, which shall be paid forthwith by the Claims Administrator. Mr. McGillicuddy's incentive award will be paid by Mr. Bowen and not the Class. Mr. McGillicuddy's incentive award is reduced by

the second-half of attorneys' fees which it is withholding from the initial payment to Stearns, Weaver for its attorneys' fee award in this matter. The Court will determine the

appropriate amount of interest at the conclusion of the Claims Administration Process in the event that funds remain to pay such interest award.

twenty-five percent due to partial forfeiture, for a total of $1,325,000.00. Pursuant to this Order, Mr. McGillicuddy is enjoined from collecting on the Virginia judgment against Mr. Bowen, subject to criminal contempt. The Claims Administrator shall pay Mr. McGillicuddy's incentive award forthwith from the amount of attorneys' fees alocated to Mr. Bowen. The remaining distribution to Mr. McGillicuddy will be subject to further order of this Court upon recommendation from the Special Master.

13. Lastly, the Court notes that it is impossible to foresee the total amount of funds necessary to complete the Claims Administration Process and to pay all costs and expenses associated with the Settlement Fund at this time. As a result, the Court reserves the right to consider taking some portion of the funds to be set aside for the States in order to ensure completion of the Claims Administration Process and the full payment of prejudgment interest to the Class.

· **DONE AND ORDERED.**

**Attachment "1"**
### STATE SURVEY REGARDING
### "COMMON FUND" AWARDS OF ATTORNEY'S FEES

| State | Authority | Citation |
|---|---|---|
| ALABAMA | ✓ | *Edelman & Combs v. Law,* 663 So.2d 957, 958 (Ala. 1995) |
| ARIZONA | ✓ | *Kerr v. Killian,* 197 Ariz. 213, 3 P.3d 1133, 1137–38 (Ariz.Ct.App.2000) |
| ARKANSAS | ✓ | *Powell v. Henry,* 267 Ark. 484, 592 S.W.2d 107, 109 (Ark.1980) |
| CALIFORNIA | ✓ | *Bell v. Farmers Ins. Exch.,* 115 Cal.App. 4th 715, 725–26, 765 (Cal.Ct.App.2004); *Cziraki v. Thunder Cats, Inc.,* 111 Cal.App. 4th 552, 557–58 (Cal.Ct.App.2003) |
| COLORADO | ✓ | *Kuhn v. State,* 924 P.2d 1053, 1058, 1060 (Colo.1996) |
| CONNECTICUT | ✓ | *Doe v. Heintz,* 204 Conn. 17, 526 A.2d 1318, 1323 (Conn.1987) |
| DELAWARE | ✓ | *Goodrich v. E.F. Hutton Group., Inc.,* 681 A.2d 1039, 1043–45 (Del.1995) |
| DISTRICT OF COLUMBIA | ✓ | *Passtou, Inc. v. Spring Valley Ctr.,* 501 A.2d 8, 11–12 (D.C.1985) |
| FLORIDA | ✓ | *Kuhnlein v. Department of Rev.,* 662 So.2d 309, 311–12 (Fla.1995) |
| GEORGIA | ✓ | *Friedrich v. Fidelity Nat'l Bank,* 247 Ga.App. 704, 545 S.E.2d 107 (Ga.2001) |
| INDIANA | ✓ | In. R. Tr. P. 23(D); *Northern Ind. Pub. Serv. Co. v. Citizens Action Coalition of Ind., Inc.,* 548 N.E.2d 153, 161–62 (Ind.1989) |
| KENTUCKY | ✓ | Ky.Rev.Stat. Ann. § 412.070; *Commonwealth of Ky. Rev. Cabinet v. Ledger,* 955 S.W.2d 539, 545 (Ky.Ct. App.1997) · |
| LOUISIANA | ✓ | La.Code Civ. Proc. Ann. art. 595; *Avants v. Kennedy,* 837 So.2d 647, 656 (La.Ct.App.2002) |
| MAINE | ✓ | *York Ins. Group of Maine v. Van Hall,* 704 A.2d 366, 368 (Me.1997) |
| MARYLAND | ✓ | *United Cable Television of Baltimore, Ltd. v. Burch,* 732 A.2d 887, 902–03 (Md.1999), *superseded in part by statute on other grounds as noted in Dua v. Comcast* |

| State | Authority | Citation |
|-------|-----------|----------|
| | | Cable of Md., Inc., *370 Md. 604, 805 A.2d 1061, 1066 (Md.2002)* |
| MASSACHUSETTS | ✓ | *Coggins v. New England Patriots Football Club, Inc.,* 550 N.E.2d 141, 143–45 (Mass.1990) |
| MISSISSIPPI | ✓ | *Yerby v. United Healthcare Ins. Co.,* 846 So.2d 179, 189–90 (Miss.2002) |
| MONTANA | ✓ | *Murer v. State Comp. Mut. Ins. Fund,* 283 Mont. 210, 942 P.2d 69, 76 (Mont.1997) |
| NEVADA | ✓ | *State v. Elcano,* 106 Nev. 449, 794 P.2d 725, 726–27 (Nev.1990) |
| NEW HAMPSHIRE | ✓ | *Private Truck Council of Am., Inc. v. State,* 517 A.2d 1150, 1157 (N.H.1986); *Claremont v. Sch. Dist. v. Governor,* 144 N.H. 590, 761 A.2d 389, 392–93 (N.H.1997) |
| NEW JERSEY | ✓ | N.J. R. Ct. 4:42–9(a)(2); *Henderson v. Camden County Municipal Utility Auth.,* 176 N.J. 554, 826 A.2d 615, 621–22 (N.J.2003) |
| NEW MEXICO | ✓ | *Martinez v. St. Joseph Healthcare Sys.,* 117 N.M. 357, 871 P.2d 1363, 1366 (N.M.1994) |
| NEW YORK | ✓ | N.Y. C.P.L.R. 909; *Seinfeld v. Robinson,* 676 N.Y.S.2d 579, 582 (N.Y.App.Div.1998) |
| NORTH CAROLINA | ✓ | *Bailey v. State,* 348 N.C. 130, 500 S.E.2d 54, 71–73 (N.C.1998) |
| OREGON | ✓ | Or. R. Civ. P. 32N(1)(c); *State Farm Mut. Auto. Ins. Co. v. Clinton,* 518 P.2d 645, 647 (Or.1974) |
| PENNSYLVANIA | ✓ | Pa. Const. Stat. § 2503; *Couy v. Nardei Enters.,* 587 A.2d 345, 346 (Pa.Super.Ct.1991) |
| RHODE ISLAND | ✓ | *Malinou v. Power,* 114 R.I. 399, 333 A.2d 420, 423–24 (R.I.1975); *Sullivan v. Oakley,* 1990 WL 10000555, at *1–3 (R.I. Sup.Ct. July 18, 1990) |
| SOUTH CAROLINA | ✓ | *Shillito v. City of Spartanburg,* 214 S.C. 11, 51 S.E.2d 95, 100, 104 (S.C.1948); *Condon v. State,* 354 S.C. 634, 583 S.E.2d 430, 432, 434–35 (S.C.2003) |
| TENNESSEE | ✓ | *Kline v. Eyrich,* 69 S.W.3d 197, 204–05 (Tenn.2002); *Hobson v. First St. Banks,* 801 S.W.2d 807, 809 (Tenn. Ct.App.1990) |
| TEXAS | ✓ | *Knebel v. Capital Nat'l Bank,* 518 S.W.2d 795, 799–801 (Tex.1994) |
| VERMONT | ✓ | *Guiel v. Allstate Ins. Co.,* 170 Vt. 464, 756 A.2d 777, 780–81 (Vt.2000) |
| VIRGINIA | ✓ | *Dupont v. Shackelford,* 235 Va. 588, 369 S.E.2d 673, 677 (Va.1988) |
| WASHINGTON | ✓ | *Covell v. City of Seattle,* 127 Wash.2d 874, 905 P.2d 324, 333 (Wash.1995) |
| WEST VIRGINIA | ✓ | *Security Nat'l Bank & Trust Co. v. Willim,* 180 S.E.2d 46, 52–53 (W.Va.1971) |
| WYOMING | ✓ | *Butler v. Conwell,* 14 Wyo. 166, 82 P. 950, 951–52 (Wyo.1905) |